W. Scott Cameron, State Bar No. 229828
**weintraub tobin** chediak coleman grodin
LAW CORPORATION
400 Capitol Mall, 11th Floor
Sacramento, California 95814
Telephone:  916.558.6000
Facsimile:   916.446.1611
Email:        scameron@weintraub.com

Kevin J. McEleney, SBN 314533
UPDIKE, KELLY & SPELLACY, P.C.
225 Asylum Street, 20th Floor
Hartford, CT 06013
Telephone:  860-548-2609
Facsimile:   860-548-2680
Email: kmceleney@uks.com

*Attorneys for Plaintiff M&T Bank f/k/a M&T Capital and Leasing Corporation*
*f/k/a People's Capital and Leasing Corp.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M&T BANK *f/k/a* M&T CAPITAL AND LEASING CORPORATION *f/k/a* PEOPLE'S CAPITAL AND LEASING CORP. <br><br> Plaintiff, <br><br> vs. <br><br> RESPONSE ENVELOPE, INC., JAL EQUITY CORP <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> **1. WRIT OF POSSESSION;** <br> **2. BREACH OF CONTRACT;** <br> **3. BREACH OF GUARANTY;** |

1 COMPLAINT

#4878098v1

1

## **COMPLAINT**

2          Plaintiff, M&T Bank, formerly known as M&T Capital and Leasing

3    Corporation, formerly known as People's Capital and Leasing Corp., by and

4    through its undersigned counsel, for its Complaint against defendants Response

5    Envelope, Inc. and JAL Equity Corp, states and alleges as follows:

6

## **PARTIES AND JURISDICTION**

7          1.      Plaintiff M&T Bank, formerly known as M&T Capital and Leasing

8    Corporation[1], which was formerly known as People's Capital and Leasing Corp.[2]

9    ("**M&T**" or "**Lender**") is a corporation organized and existing pursuant to the laws

10   of the State of Connecticut with its principal place of business located at 850 Main

11   Street, Bridgeport, Connecticut 06604.

12         2.      Defendant Response Envelope, Inc. ("**Response Envelope**") is a

13   California corporation with its principal place of business located at 1340 South

14   Baker Ave. Ontario, CA 91761 and may be served through its agent of service Koy

15   Saechao, at 2710 Gateway Oaks Drive, Sacramento, CA. Defendant JAL Equity Corp

16   ("**JAL Equity**") (together with Response Envelope, the "**Defendants**") is a Nevada

17   corporation with its principal place of business located at 101 Workman Court

18   Eureka, MO 63025 and 3600 Torrey Pines Blvd Sarasota, FL 34238-2827 may be

19   served through its California Registered Corporate Agent Authorized Employee Koy

20   Saechao, at 2710 Gateway Oaks Drive, Sacramento, CA.

21         3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §

22   1332(a)(1) in that the matter in controversy exceeds $75,000.00, exclusive of interest

23   and costs, and is between citizens of different states.

24

---

25   [1] As of March 31, 2025, M&T Capital and Leasing Corporation., a Connecticut Corporation located in Bridgeport,
Connecticut, merged with and into M&T Bank, a New York state-chartered bank with a principal place of business

26   located at One M&T Plaza, Buffalo, New York, under section 33-819 of the Connecticut General Statutes with M&T
Bank as the surviving bank. Accordingly, M&T is successor by merger of the Lease Documents.

27   [2] As of April 2, 2022, People's United Bank, N.A., a national banking association located in Bridgeport, Connecticut,
merged with and into M&T Bank, a New York state-chartered bank with a principal place of business located at One

28   M&T Plaza, Buffalo, New York, with M&T Bank as the surviving bank. M&T Capital and Leasing Corp. became a
subsidiary of M&T Bank as of April 2, 2022.

#4878098v1

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the defendant is domiciled in this district and a substantial part of the property that is the subject of this action is situated in this district.

## GENERAL ALLEGATIONS

5.      On or about July 15, 2019, M&T and Response Envelope entered into Master Lease Agreement No. 5904, as amended from time to time ("**Master Lease Agreement**"). A true and correct copy of the Master Lease Agreement is attached hereto as **Exhibit A**.

6.      On or about July 15, 2019, Response Envelope entered into Schedule No. 001 to the Master Lease Agreement, as amended from time to time ("Schedule No. 1"). A true and correct copy of Schedule No. 1 is attached hereto as **Exhibit B**.

7.      On or about June 8, 2020, Response Envelope entered into Schedule No. 002 to the Master Lease Agreement, as amended from time to time ("Schedule No. 2"). A true and correct copy of Schedule No. 2 is attached hereto as **Exhibit C**.

8.      On or about June 8, 2020, Response Envelope delivered a Demand Promissory Note in favor of M&T in the amount of $1,745,397.00, as amended from time to time ("Demand Note 1"). A true and correct copy of Demand Note 1 is attached hereto as **Exhibit D**.

9.      On or about February 7, 2022, Response Envelope entered into Schedule No. 003 to the Master Lease Agreement, as amended from time to time ("Schedule No. 3"). A true and correct copy of Schedule No. 3 is attached hereto as **Exhibit E**.

10.     On or about February 7, 2022, Response Envelope delivered a Demand Promissory Note in favor of M&T in the amount of $1,649,610.00, as amended from time to time ("Demand Note 2"). A true and correct copy of Demand Note 2 is attached hereto as **Exhibit F**.

#4878098v1

11.     On or about May 12, 2022, Response Envelope entered into Schedule No. 004 to the Master Lease Agreement, as amended from time to time ("Schedule No. 4"). A true and correct copy of Schedule No. 4 is attached hereto as **Exhibit G**.

12.     On or about May 12, 2022, Response Envelope delivered a Demand Promissory Note in favor of M&T in the amount of $2,231,824.50, as amended from time to time ("Demand Note 3" and together with Demand Note 1 and Demand Note 2, collectively, the "Notes"). A true and correct copy of Demand Note 3 is attached hereto as **Exhibit H**.

13.     On or about December 29, 2023, Response Envelope entered into a Covenant Rider to the Master Lease Agreement, as amended from time to time (the "Covenant Rider"). A true and correct copy of the Covenant Rider is attached hereto as **Exhibit I**.

14.     Pursuant to Schedule Nos. 1 through 4, Response Envelope leased from M&T the equipment described in the attached Schedule A to each of Schedule Nos. 1 through 4 (collectively, the "Equipment"), specifically:

| Schedule No. | Equipment |
| --- | --- |
| 1 | • One (1) 2018 W+D Halm IJet-7956 w/ Dual Feeders, Memjet Inkjet system, Xltron RIP and 10 liter bladder S/N 7656 |
| 2 | • One (1) 2020 W+D 628RC Rotary Envelope Manufacturing Machine with Center Delivery S/N 16456 |
| 3 | • One (1) 2022 W+D 628BC Rotary Envelope Manufacturing Machine S/N M16537 |
| 4 | • One (1) 2023 W+D 328RC Reel Fed Rotary Envelope Manufacturing Machine S/N M16560 |

#4878098v1

|  |  |
|---|---|
|  |  |

15. Pursuant to the terms of the Master Lease Agreement and Schedule Nos. 1 through 4, Response Envelope agreed to make payments to M&T as follows:

| Schedule No. | Number of Monthly Payments | Amount of Monthly Payments | Total Principal Due |
|---|---|---|---|
| 1 | 84 | $3,569.85 | $284,200.00 |
| 2 | 96 | $23,261.00 | $2,539,330.00 |
| 3 | 96 | $25,010.00 | $1,832,900.00 |
| 4 | 84 | $31,806.00 | $2,479,805.00 |

16. On or about December 29, 2023, guarantor JAL Equity entered into a Corporate Guaranty ("Guaranty") in favor of M&T. A true and correct copy of the Guaranty is attached hereto as **Exhibit J**.

17. Response Envelope failed to make all payments due in accordance with the terms of the Master Lease Agreement, Schedule Nos. 1 through 4, the Notes, and the Guaranty (collectively, the "Lease Documents") and has defaulted on the Lease Documents.

18. On or about July 10, 2025, M&T, sent to Defendants a Notice of Default, Acceleration, and Demand for Payment, which default was the result of Response Envelope's failure to make all payments due pursuant to the Lease Documents. A true and correct copy of the original Notice of Default, Acceleration, and Demand for Payment is attached hereto as **Exhibit K**.

19. Pursuant to the Lease Documents, the Defendants remain obligated and responsible to M&T for the outstanding balance of $ 4,128,836.26 as of July 31, 2025, plus costs, expenses, attorneys' fees, and default interest which continue

5 COMPLAINT

#4878098v1

to accrue and are required under the Master Lease Agreement and Schedules 1-4 to surrender the Equipment immediately to M&T.

20.     M&T has performed all its obligations in accordance with the Lease Documents.

21.     Defendants have breached the terms of the Lease Documents by, *inter alia*, failing, refusing, or neglecting to pay M&T the remaining monies due and owing under the Lease Documents and by failing, refusing, or neglecting to surrender the Equipment to M&T.

## **Count One – Writ of Possession**

22.     M&T repeats and realleges paragraphs 1 through 17 as if fully set forth herein.

23.     The Lease Documents entered into by and between M&T, as successor by merger, and Defendants comport with the standard conduct of business within the industry.

24.     Pursuant to the Lease Documents, if one or more events of default shall occur and be continuing with regard to the obligations, M&T shall have such rights and remedies with respect to the Equipment as provided under the Lease Documents and any and all of the rights and remedies at law and equity, including, but not limited to, entry of any location where the Equipment is located to take possession of it without process of law.

25.     Response Envelope has defaulted under the terms of the Master Lease Agreement pursuant to its failure to make all payments when due which constitutes an event of default pursuant to Section 17(i) of the Master Lease Agreement.

26.     M&T is entitled to possession of the Equipment under the Lease Documents.

27.     Response Envelope wrongfully retains possession and control of the Equipment. As each day passes and the Equipment is not repossessed, the Equipment continues to depreciate in value.

6 COMPLAINT

#4878098v1

28.    Upon information and belief, the Equipment in located in San Bernardino County, California.

29.    The description of the personal property is the Equipment described on each Schedule A to Schedule Nos. 1 through 4, as described in detail in Paragraph 11.

30.    The Equipment in question is not earnings and not exempt from execution.

31.    The repossession of the Equipment is not sought to hinder, delay or defraud any other creditor of Response Envelope.

32.    Based upon the facts alleged herein, there is a substantial likelihood that M&T will prevail on the merits of its claim.

33.    Upon information and belief, Response Envelope appears to be exercising a degree of control over the Equipment and continues to receive the benefit of use of the Equipment.

34.    Upon information and belief, the Equipment has not been taken for any tax, assessment, or fine levied by virtue of any law of this State, against the property of M&T, nor seized under any lawful process against the goods and chattels of M&T subject to such lawful process, nor held by virtue of any order for replevin against M&T.

35.    M&T has a right to recover and repossess the Equipment with a right to immediate possession and damages for such wrongful detention.

36.    M&T has a right to pursue any legal remedy available to it to collect the obligations outstanding, to enforce its remedies available to it both under the Lease Documents and otherwise, including, without limitation, the right to take possession of the Equipment and dispose of the same.

37.    Upon information and belief, the fair market value of the Equipment tis approximately $4,250,000.00 depending on its condition.

#4878098v1

38.     By reason of such wrongful detention of the Equipment, M&T has sustained damages in the amount of $4,128,836.26 as of July 31, 2025, plus costs, expenses, attorneys' fees, and default interest which continue to accrue.

39.     M&T may suffer irreparable harm if its request for a writ of possession is denied and the Equipment continues to depreciate in value.

40.     M&T has demanded return of the Equipment, however, Response Envelope has failed and refused to return the same.

41.     M&T has retained the law firms of Updike, Kelly & Spellacy, P.C. and Weintraub Tobin and has agreed to pay said firms a reasonable fee for their services. Pursuant to the Lease Documents, M&T is entitled to recover from Defendants its attorneys' fees and costs incurred in enforcing the Lease Documents.

## Count Two – Breach of Contract

42.     M&T repeats and realleges paragraphs 1 through 37 as if fully set forth herein.

43.     M&T is the owner of the Lease Documents, pursuant to which Response Envelope promised to make certain monthly payments for its use and possession of the Equipment.

44.     Response Envelope has breached the Lease Documents due to its failure to make all monthly payments when due.

45.     On or about July 10, 2025, M&T sent to Response Envelope a Notice of Default, Acceleration, and Demand for Payment ("Default Letter"), which default was the result of Response Envelope's failure to make all payments due under the terms of the Lease Documents.

#4878098v1

46.    Pursuant to the Lease Documents, Response Envelope remains obligated and responsible to M&T for the outstanding balance of $4,128,836.26 as of July 31, 2025, plus costs, expenses, attorneys' fees, and default interest which continue to accrue, subject only to setoff of funds received by M&T from the disposition of certain units of Equipment.

47.    M&T has retained the law firms of Updike, Kelly & Spellacy, P.C. and Weintraub Tobin and has agreed to pay said firms a reasonable fee for their services. Pursuant to the Lease Documents, M&T is entitled to recover from Response Envelope its attorneys' fees and costs incurred in enforcing the Lease Documents.

### Count Three – Breach of Guaranty (JAL Equity Corp)

48.    M&T repeats and realleges paragraphs 1 through 45 as if fully set forth herein.

49.    M&T is the owner of the Guaranty, pursuant to which JAL Equity agreed to guarantee the prompt payment in full of all indebtedness and obligations of every kind and nature then and thereafter owing by Response Envelope to M&T under the Master Lease Agreement and Schedules No. 1-4.

50.    JAL Equity breached the Guaranty due to its failure to pay all amounts due under the Lease Documents after Response Envelope failed to pay the same.

51.    On July 10, 2025, M&T sent to JAL Equity a Notice of Default, Acceleration, and Demand for Payment, which default was the result of Defendants' failure to make all payments due pursuant to the Lease Documents.

52.    Pursuant to the Lease Documents, JAL Equity remains obligated and responsible to M&T for the outstanding balance of $4,128,836.26 as of July 31,

#4878098v1

1    2025, plus costs, expenses, attorneys' fees, and default interest which continue to

2    accrue.

3         53.    M&T has retained the law firms of Updike, Kelly & Spellacy, P.C. and

4    Weintraub Tobin and has agreed to pay said firms a reasonable fee for their

5    services. Pursuant to the Lease Documents, M&T is entitled to recover from JAL

6    Equity its attorneys' fees and costs incurred in enforcing the Lease Documents.

7                          **PRAYER FOR RELIEF**

8         WHEREFORE, plaintiff M&T Bank claims the following relief from the

9    Court:

10        1. Seizure and possession of the Equipment;

11        2. Monetary damages;

12        3. Costs of seizure;

13        4. Attorneys' Fees, Costs, and Expenses;

14        5. Interest; and

15        6. Such other and further relief as the Court deems just and proper.

16   Respectfully submitted,

17
     Dated:  August 22, 2025              **weintraub tobin** chediak coleman grodin
18                                         law corporation

19

20                                         By:___/s/ W. Scott Cameron_____
                                                W. Scott Cameron
21

22                                         Attorneys for Plaintiff M&T Bank f/k/a
                                           M&T Capital and Leasing Corporation f/k/a
23                                         People's Capital and Leasing Corp.

24

25

26

27

28

                                    10
                                 COMPLAINT

#4878098v1

# EXHIBIT A

## MASTER LEASE AGREEMENT NO. 5904

This Master Lease Agreement is entered as of the 15th Day of July, 2019 by and between People's Capital and Leasing Corp., a Connecticut corporation, having its principal place of business at 850 Main Street, BC-03, Bridgeport, CT 06604 (the "Lessor") and Response Envelope, Inc. a corporation, organized under the laws of the State of California, having its chief executive office and place of business at 1340 South Baker Avenue, Ontario, CA 91761 (the "Lessee").  Lessor and Lessee agree as follows:

**1.  LEASE OF EQUIPMENT.**  This Master Lease Agreement is hereinafter referred to as this "Agreement". Lessor agrees to lease to Lessee and Lessee agrees to lease from Lessor the equipment and other personal property described in each schedule which may be executed from time to time by the parties hereto and identified as a schedule to this Agreement (individually, a "Schedule" and collectively the "Schedules", which terms shall include all amendments, riders and supplements thereto) upon the terms and conditions set forth in this Agreement and all amendments, riders and supplements hereto and in the applicable Schedule.   Such equipment and other personal property, together with all parts, related software (embedded therein or otherwise), any replacements, replacement parts, additions, accessions, repairs, attachments and accessories incorporated therein and/or affixed thereto and all proceeds thereof including the proceeds of all insurance policies thereon, are hereafter referred to collectively as the "Equipment" and individually as an "item of Equipment".   Each Schedule shall be deemed to incorporate the terms of this Agreement and each Schedule shall constitute a separate and distinct lease of the Equipment described in such Schedule.

**2.  TERM, RENT AND LATE PAYMENTS.**  Each Schedule shall be effective upon, and the terms thereof shall be binding on the parties hereto upon, execution by the parties; provided however, that the rental term of a Schedule shall be deemed to commence on the earlier of the date of Lessee's acceptance of the Equipment or the Rental Commencement Date and, unless sooner terminated as herein provided, shall thereafter continue until payment by Lessee of the number of successive monthly (or quarterly) rental payments indicated in the Schedule.  All rent shall be paid at Lessor's place of business shown above or such other place as Lessor may designate in writing to Lessee.  All rents shall be paid without notice or demand and Lessee's obligation to pay rent shall be absolute and unconditional and Lessee shall not be entitled to any abatement of rent, reduction thereof or set-off against rent.   Time is of the essence in the performance of Lessee's obligations under this Agreement and each Schedule.  If Lessee does not make any payment required under any Schedule within five (5) days of its due date, Lessor may, at its election, and subject to prior exercise of its right of acceleration, accept the payment in arrears, and the Lessee shall pay the Lessor, as liquidated damages, (i) a late charge equal to five (5%) of such defaulted payment and (ii)additional interest on such defaulted payment from one (1) month after the due date until paid at the lower of one and one-half percent (1.5%) per month or the maximum rate permitted by law. . Any amount received by the Lessor determined to be in excess of the highest rate of interest permitted by law shall be refunded to the Lessee.  A returned check fee or a non-sufficient funds charge of $ 25.00 will be charged to Lessee for each check that is returned for any reason including non-sufficient funds or uncollected funds.

**3.  RENTAL COMMENCEMENT DATE.**  The advance payment with respect to a Schedule, if any, shall be due and payable upon execution of the Schedule.  The first periodic installment of rent (exclusive of the advance rent,

if any) under a Schedule shall be due and payable on the first (1st) day of the month following the date of Lessee's acceptance of the Equipment covered by the Schedule ("Rental Commencement Date") together with the interim rent.  Lessee shall pay Lessor interim rent in an amount equal to one thirtieth (1/30th) of the first periodic rental payment multiplied by the number of days from and including the date of Lessee's acceptance of the Equipment to the Rental Commencement Date.  The date of Lessee's acceptance of the Equipment shall be the earlier of (i) the date when the Lessee executes and delivers to Lessor a delivery certificate in form provided by Lessor (the "Delivery Certificate") or (ii) five (5) days after the date of delivery of the Equipment to Lessee, in which latter case, it shall be conclusively presumed as between Lessor and Lessee that the Equipment was delivered in good repair and satisfactory condition and that Lessee unconditionally accepted the Equipment on said fifth (5th) day after delivery.  Lessee authorizes Lessor to insert in a Schedule the Rental Commencement Date determined as contemplated by this Section 3.  However, the parties may select another Rental Commencement Date by noting the same in the Special Provisions section found in the Schedule or by a separate writing signed by Lessor and Lessee.

**4.  FAILURE OF DELIVERY.**  If the Equipment specified in a Schedule is not delivered to Lessee within thirty (30) days after the Estimated Date of Shipment shown in the Schedule, Lessor shall have the election, in its sole discretion, to cancel and terminate the Schedule and its obligations thereunder by written notice to Lessee.

**5.  NONCANCELABLE NET LEASE.** UPON ACCEPTANCE OF THE EQUIPMENT UNDER A SCHEDULE, THE SCHEDULE AND THIS AGREEMENT SHALL CONSTITUTE A NONCANCELABLE NET LEASE COVERING SUCH EQUIPMENT.  THE OBLIGATIONS OF THE LESSEE TO PAY ALL RENT AND OTHER AMOUNTS WHEN DUE AND TO PERFORM AS REQUIRED UNDER EACH SCHEDULE ARE UNCONDITIONAL AND IRREVOCABLE.  SUCH OBLIGATIONS ARE NOT SUBJECT TO CANCELLATION, TERMINATION, MODIFICATION, REPUDIATION, REVOCATION OR EXCUSE AND UNLESS OTHERWISE SPECIFICALLY PROVIDED IN THE SCHEDULE, THE SCHEDULE MAY NOT BE PREPAID EXCEPT BY PAYING THE FULL AMOUNT OF THE AGGREGATE REMAINING RENTALS.  LESSEE SHALL NOT BE ENTITLED TO ANY ABATEMENT, REDUCTION, OFFSET OR COUNTERCLAIM WITH RESPECT TO THESE OBLIGATIONS FOR ANY REASON WHATSOEVER, WHETHER ARISING OUT OF CLAIMS AGAINST THE LESSOR, THE MANUFACTURER OR SUPPLIER, DEFECT IN, LACK OF FITNESS FOR USE OF, LOSS OF POSSESSION OR USE OF OR DAMAGE OR DESTRUCTION OF THE EQUIPMENT OR ANY ITEM OF EQUIPMENT, ANY PROHIBITION AGAINST USE OR OTHERWISE.

**6.  LESSEE ACKNOWLEDGEMENT.**  Lessee acknowledges that (i) the Lessor did not select, manufacture or supply the Equipment and (ii) the Lessor acquired or will acquire the Equipment or right to use the same in connection with the applicable Schedule and either (a) the Lessee has received, reviewed and approved the contract covering the Equipment purchased from the supplier of the Equipment for lease to the Lessee or (b) the Lessor has informed or advised Lessee in writing either previously or by such Schedule of the following: the identity of the supplier of the Equipment; that the Lessee may have rights under the supply contract and that the Lessee may contact the supplier for a description of any such rights Lessee may have under the supply contract.

**7. NO WARRANTY**. LESSOR NEITHER MAKES NOR SHALL BE DEEMED TO HAVE MADE ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OR REPRESENTATION AS TO ITS DESIGN, QUALITY, CAPABILITY, OR CONDITION OR AS TO ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. Lessee acknowledges that the Equipment is of a size, design, capacity and manufacture selected solely by it and Lessee looks solely to the manufacturer or vendor for delivery, installation and servicing of the Equipment. Lessor shall not be liable for specific performance of this Agreement or any Schedule or for damages of any type, if, with or without cause, the manufacturer or vendor fails to timely deliver and/or install the Equipment, and Lessor shall have no obligation to inspect, install, test, adjust, maintain or otherwise repair or service the Equipment nor shall it be liable for any defects, latent or patent, in any of the Equipment. Lessor will assign to Lessee, to the extent assignable, any warranties of the manufacturer or vendor, provided that (i) Lessee is not in default hereunder, (ii) any recoveries are used to repair or replace defective Equipment and (iii) any action by Lessee shall be at its sole cost and expense. Lessor does not assume liability for or make any representation as to the treatment by Lessee of any Schedule, the Equipment or the rental payments, for financial statement or tax purposes. Lessee is advised to consult its attorney or accountant with respect thereto.

**8. INDEMNIFICATION BY LESSEE**. Lessee shall exonerate and indemnify Lessor against and hold it harmless from, any and all claims, actions, suits, proceedings, losses, judgments, damages and liabilities, including reasonable attorney's fees and other costs and expenses in connection therewith or incident thereto, for death or injury to any person whomsoever and for any loss of or damage to or destruction of any property whatsoever and irrespective of the legal basis of such claim or action including the doctrine of strict liability in tort or any similar doctrine, caused by or arising out of or allegedly caused by or arising out of, or in any way connected with or resulting from or allegedly resulting from any of the Equipment, including, without limiting the generality of the foregoing, the manufacture, selection, delivery, possession, use, operation, storage, maintenance or return thereof, at any time during the term hereof, or (if later) until the Equipment has been redelivered to Lessor as provided in Section 15 of this Agreement. Lessee shall also exonerate and indemnify Lessor against and hold it harmless from any and all claims, actions, suits proceedings, losses, judgments, damages and liabilities, including reasonable attorney's fees, which Lessor may suffer by reason of any patent infringement or alleged patent infringement in connection with the ownership, use or operation of the Equipment. This covenant of indemnity shall continue in full force and effect notwithstanding termination of this Agreement and all Schedules. In any case where this Agreement covers any motor vehicle, Lessee agrees to indemnify and hold Lessor harmless from any liability or expense related to traffic violations and related fines or penalties, whether or not the same shall arise from moving violations, including parking and toll violations.

**9. MAINTENANCE OF EQUIPMENT**. Lessee shall maintain the Equipment in good repair and condition and in accordance with the manufacturer's instructions and procedures and the requirements of any applicable insurance or manufacturer's warranty and of any governmental authority having jurisdiction. Lessee shall pay for all fuel, service, inspection, overhaul, replacements, substitutions, materials and labor necessary or desirable for the proper use, repair, operation and maintenance of the Equipment.

**10. FEES AND TAXES.**  Lessee agrees to pay promptly when due all registration, title, license and other fees, assessments and sales, use, gross receipts, ad valorem, property and any and all other taxes, imposed by any state, federal, local or foreign government upon the purchase or any use, ownership, rental, shipment, transportation, delivery or operation of the Equipment or upon or measured by any payments due hereunder (or to reimburse Lessor for the same if local law does not permit the direct payment thereof by Lessee) and any fines, penalties and interest thereon.  In no event shall Lessor have any obligation to advise, submit bills or furnish any advice or material to Lessee with respect to any tax on or relating to the Equipment or its use.  If local law does not permit direct payment by the Lessee of any of the foregoing and/or if Lessor is required to make a report or return, Lessee will timely advise Lessor as to its inability under local law to make direct payment and the amount thereof and/furnish Lessor with such forms, data and information as will enable it to make and file such report or return.  Lessee shall promptly furnish to Lessor written evidence of Lessee's payment of the foregoing when due or, at Lessor's request, remit such payments to Lessor.  If any of the foregoing shall be paid by Lessor, Lessee shall reimburse Lessor therefor promptly upon demand as additional rent hereunder.  If any report or return is required to be made with respect to the foregoing, Lessee will do so promptly.

**11. RISK OF LOSS.**  All risks of loss, theft, damage or destruction of the Equipment from any cause shall be borne by Lessee.  Lessee shall promptly notify Lessor in writing of any such loss, theft, damage or destruction of the Equipment or any item of Equipment. In the event of damage of any kind to the Equipment or any item of Equipment (unless the same is damaged beyond repair) Lessee shall, at Lessee's expense, place the same in good repair, condition and working order.  If the Equipment under a Schedule is determined by Lessor to be lost, stolen, destroyed or damaged beyond repair, Lessee shall immediately pay Lessor, in addition to unpaid rent, late charges and additional rent then past due, an amount equal to the aggregate of (i) all unmatured rentals to become due during the remaining term of the Schedule covering said Equipment and (ii) the purchase price which Lessee has the option or obligation to pay (or may be required by Lessor to pay) pursuant to any purchase agreement to purchase the Equipment at the expiration of the Schedule, but if the purchase price is the fair market value of the Equipment or if there is no purchase agreement, then the estimated residual value at the end of the scheduled lease term (the amounts under (i) and (ii) to be discounted to present value at the rate of two percent (2%) per annum), less the net amount of the recovery, if any, actually received by Lessor from insurance on the Equipment.  Upon such payment in full the applicable Schedule shall terminate.

**12.    INSURANCE.**  Lessee shall, at its sole expense, procure and maintain throughout the term of a Schedule:

(a) property insurance insuring the Equipment against all risks of physical loss, theft, damage and destruction ( including specific coverage for loss by flood and earthquake, if requested by Lessor ) and extended coverage in an amount equal to the greater of (i) the amount Lessee would be required to pay to Lessor under Section 11 in the event of the total destruction of the Equipment  or (ii) the full replacement value of the Equipment, with Lessor and its assigns named by endorsement with " lender's loss payable provisions" under such policy, and

(b) primary (i.e., without right of contribution from any other policy) commercial general liability and/or commercial auto liability insurance with respect to the Equipment and the use thereof in such amounts as may be acceptable to Lessor, such policy to name Lessor as additional insured.

All insurers and coverage must be satisfactory to Lessor. Lessee shall deliver to Lessor Evidence of Commercial Property Insurance on ACORD form 28 ("Evidence")(or equivalent) with ISO special form (or equivalent) including flood and earthquake coverage (if requested by Lessor) and Certificate of Liability Insurance on ACORD form 25 (or equivalent) or other proof of insurance satisfactory to Lessor. Said forms shall provide that the policies of insurance may not be canceled or altered without at least (30) days prior written notice to Lessor. Lessor may apply the proceeds of said insurance to replace or repair the Equipment and/or to satisfy Lessee's obligations hereunder. If Lessee shall fail to procure and continue such insurance in full force and effect or pay when due any insurance premium, Lessor may (but shall not be required to) procure such insurance or make such premium payments and the costs thereof shall be paid by Lessee to Lessor as additional rent with the next rental payment. All insurance policies insuring against risk of physical loss of the Equipment shall provide that the coverage shall not be invalidated against Lessor because of any violation of any condition or warranty contained in any policy or application therefor by Lessee or by reason of any action or inaction of Lessee. Lessee hereby irrevocably appoints Lessor as Lessee's attorney-in-fact to file, settle or adjust and receive payment of claims under any insurance policy on the Equipment and to endorse Lessee's name on any checks, drafts or other instruments of payment on such claims. Upon request Lessee shall provide Lessor with copies of all policies and endorsements indicating Lessor's interest in the policies.

**13. USE OF THE EQUIPMENT.** Lessee will use the Equipment solely for business or commercial purposes. Lessee warrants that the Equipment will at all times be used and operated by it in compliance with the conditions of any applicable insurance, by competent trained operators in accordance with manufacturer's instructions and under and in compliance with the laws of the jurisdiction in which such Equipment may be operated. Lessee shall not alter, modify or make additions or improvements to the Equipment without Lessor's prior written consent. Unless otherwise agreed in writing, any such alterations, modifications, additions or improvements, and all repairs, spare parts and supplies shall forthwith upon the making or purchase thereof become the property of the Lessor and shall be subject to the terms of this Agreement and the applicable Schedule.

**14. ADDITIONAL LESSEE COVENANTS:** Lessee hereby agrees and covenants as follows: (i) Lessee shall not assign or transfer this Agreement or any Schedule or transfer or sublease the Equipment, or remove or permit the Equipment or any parts thereof to be removed from the Equipment location indicated in the applicable Schedule or permit the Equipment to be used or possessed by anyone other than Lessee or Lessee's employees; (ii) Lessee shall keep Lessee's interest in the Equipment and each unit of Equipment free and clear of any and all liens, charges and encumbrances, including but not limited to, any security interest and any lien for storage, labor, service, materials or arising under laws or regulations.; (iii) Lessee shall keep each unit of Equipment free and clear of liens, rights of distraint, charges, encumbrances or claims of the owner of the real estate in which such unit is installed and any mortgagee or other present or future creditor obtaining a lien on such real estate and will, upon the request of Lessor, obtain and deliver a waiver of any of the foregoing as to the Equipment in recordable form supplied by Lessor therefor; (iv) the Equipment shall be and remain personal property notwithstanding the manner in which the Equipment may be attached or affixed to realty; (v) unless the Equipment is purchased by Lessee as authorized in a Schedule or separate written agreement, upon the expiration or termination of the term of a Schedule, Lessee shall have the duty and Lessor shall have the right to

remove the Equipment from the premises whereon the same is located whether or not affixed or attached to the realty at the sole cost and expense of Lessee and the Lessor shall not be liable for any damage caused to the realty or any building by the removal of the Equipment and Lessee shall indemnify Lessor against any such damage; (vi) Lessee will at Lessor's request securely affix conspicuous tags or plates on the Equipment containing a notation that the same is owned by Lessor; (vii) Lessee authorizes Lessor to file a financing statement and amendments thereto describing the Equipment and any additional collateral securing Lessee's obligations hereunder and under the Schedules, which may be filed either before or after Lessee's execution of any related Schedule (and Lessee agrees to pay any filing fees and/or costs with respect thereto and for lien searches) and if and to the extend Lessee has any ownership interest in the Equipment now or in the future, Lessee hereby grants to Lessor a security interest in the Equipment to secure each Schedule and all other debts, obligations and liabilities of Lessee to Lessor whether direct, contingent or joint and several, now existing or hereafter arising (including obligations assigned to Lessor); (viii) Lessee agrees that it will not change the State where it was incorporated or otherwise organized, nor change its name or address without providing Lessor with thirty (30) days prior written notice; (ix) Lessee will allow Lessor and its representatives free access to the Equipment at all times during normal business hours for purposes of inspection and repair, and following an Event of Default, Lessor shall have the right to demonstrate and show the Equipment to others; (x) Lessee will furnish to Lessor (and will cause any Guarantor of Lessee's obligations hereunder and/or under a Schedule ("Guarantor") other than an individual Guarantor to furnish to Lessor: (a) its (and the Guarantor's) unaudited quarterly financial statements to include both balance sheet and income statements within sixty (60) days after the end of its first three quarters in each fiscal year, (b) its (and the Guarantor's) audited annual financial statement certified by an independent certified public accountant within one hundred twenty (120) days after the close of its (and the Guarantor's) fiscal year, which shall be prepared in accordance with generally accepted accounting principles and (c) all other financial information and reports that Lessor may from time to time reasonably request, including income tax returns of Lessee and any Guarantor; (xi) if an individual guarantees the obligations of the Lessee hereunder and/or under a Schedule, Lessee will cause such individual guarantor to furnish to Lessor with an updated annual personal financial statement by April 30th of each calendar year and a copy of his/her annual Federal income tax return within fifteen (15) days after the tax return is filed; (xii) Lessee and any Guarantor agrees that any financial statements or other nonpublic information which Lessee or any Guarantor provides to Lessor may be disclosed by Lessor for legitimate business purposes to Lessor's affiliates, attorneys, advisors, recourse providers, prospective Equipment remarketers, assignees or participants, auditors or other parties pursuant to law, and (xiii) Lessee shall comply with all applicable federal, state and local laws, rules, ordinances, regulations and orders applicable to it; and (xiv) Lessee will execute and deliver to Lessor such further documents and take such further action as Lessor may require in order to more effectively carry out the intent and purpose of this Agreement.

**15. RETURN OF EQUIPMENT**.  Upon the expiration or termination of the term of a Schedule, and provided that the Lessee has not (upon the Schedule expiration) purchased the Equipment pursuant to a purchase option or purchase agreement then in existence between Lessor and Lessee, Lessee shall return the Equipment to Lessor in good order and repair, ordinary wear and tear excepted.  Equipment returned to Lessor shall be properly prepared by Lessee for shipment by common carrier at Lessee's expense, and shall be shipped with insurance and freight prepaid to such location within the Continental United States as shall be designated in writing by Lessor.  Should there be a purchase option or purchase agreement in existence upon the expiration of the term

of a Schedule and should the Lessee fail to exercise and/or consummate such purchase and pay Lessor the purchase price for the Equipment therein provided within ten (10) days after the expiration of the term of the Schedule or, absent the existence of such purchase option or purchase agreement, should the Lessee fail to return the Equipment to the Lessor as provided above within ten (10) days after the expiration of the term of the Schedule, the term of the Schedule and any renewal term shall, at the sole option of Lessor exercised by notice to the Lessee, be automatically extended for additional terms of one (1) year each, at the highest monthly rent payable during the initial lease term or any prior renewal term ("renewal rent").  All provisions applicable to the initial term shall apply to the extended or renewal term or terms.  Should Lessor not exercise its option to renew the term following a failure by Lessee to timely return the Equipment or exercise and consummate its purchase option (if any), Lessee shall be obligated to pay Lessor the renewal rent, monthly, from the expiration date through the month in which the Equipment is returned as aforesaid.

**16. LESSEE REPRESENTATIONS AND WARRANTIES**.  Lessee warrants and represents to Lessor on the date of its execution of this Agreement and each Schedule that (i) unless it is an individual or sole proprietorship, Lessee is duly organized, validly existing and in good standing under applicable state law of the state in which it is organized (as indicated in the introductory paragraph of this Agreement) and is duly qualified to do business wherever necessary to carry on its business and operations and to lease or own its property; (ii) Lessee has full power and authority to execute, deliver and perform its obligations under this Agreement and all Schedules hereto; (iii) the execution and delivery of this Agreement and all Schedules hereto have been authorized by all requisite corporate, partnership or limited liability company action; (iv) each Schedule is a legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms; (v) the execution, delivery and performance of this Agreement and the Schedules hereto do not and will not constitute a breach, default or violation of Lessee's governing documents (such as its articles of incorporation, charter, by-laws, partnership or limited liability company agreements) or any other agreement, law, order, lease, judgment or injunction to which it is a party or may be bound; (vi) no consent or approval of, notice to, or filing with any governmental authority is required for Lessee to sign, deliver and perform under this Agreement and each Schedule; (vii) there are no pending or  threatened actions or proceedings before any court or administrative agency that are likely to have a material adverse effect on Lessee, nor is Lessee in default under any loan, lease or purchase obligation; (viii) the financial statements and other information furnished and to be furnished to Lessor are and will be true and correct in all material respects; (ix) there have been no material adverse changes in the financial condition or operation of Lessee since the date of its financial statements provided to Lessor; (x) Lessee has filed all tax returns required to be filed prior to the date of this Agreement and each Schedule taking into account any extension of time to file granted or permitted by the taxing authority and has paid or adequately provided for all taxes payable by Lessee; and (xi) Lessee's exact legal name, State of incorporation (or if not a corporation, State of organization) and chief executive office are accurately set forth in the introductory paragraph of this Agreement and the Federal Identification number of Lessee is as specified below Lessee's signature.

**17. DEFAULT**.  The occurrence of any one of the following shall constitute an "Event of Default" hereunder and under each Schedule hereto; (i) Lessee fails to pay any installment of rent, additional rent, or other amount due hereunder or under a Schedule on or before the fifth (5th) day following the date when the same becomes due and payable; (ii) Lessee removes, sells, transfers, encumbers, or parts with possession of the Equipment or any

items of Equipment or attempts to do any of the foregoing; (iii) Lessee fails to maintain in force the required insurance on, or in connection with, the Equipment in compliance herewith or fails to provide loss payable protection to Lessor in form satisfactory to Lessor; (iv) any representation or warranty made by Lessee herein or in any other agreement between the parties or in any statement given to Lessor shall be materially untrue; (v) Lessee shall fail to observe or perform any of the other obligations required to be observed or performed by Lessee hereunder or under a Schedule, or Lessee or any Guarantor shall fail to observe or perform any other obligation or indebtedness of Lessee or such Guarantor to Lessor otherwise owing or due by Lessee to Lessor in any other agreement now or hereafter executed between Lessee or Guarantor and Lessor, and such failure shall continue uncured for twenty (20) days after written notice thereof to Lessee or such Guarantor; (vi) Lessee or any Guarantor shall (a) fail to pay any indebtedness of the Lessee or such Guarantor for borrowed money or any interest or premium thereon, when due (whether by scheduled maturity required prepayment, acceleration, demand or otherwise) or (b) fail to perform or observe any term, covenant, or condition on its part to be performed or observed under any agreement or instrument relating to such indebtedness for borrowed money when required to have been performed or observed, if the effect of such failure to perform or observe is to accelerate or permit the acceleration of such indebtedness, or if any such indebtedness shall be declared to be due or payable or required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof; (vii) if Lessee leases the premises where the Equipment is located, a breach of such lease by Lessee and the commencement of an action by the landlord to evict Lessee or to repossess the premises; (viii) Lessee or any Guarantor sells, leases or disposes of any of its assets except in the ordinary course of its business and except for the disposition of any obsolete property not useful to Lessee or such Guarantor; (ix) Lessee or any Guarantor ceases doing business as a going concern, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or an insolvent, files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation, or files an answer admitting the material allegations of a petition filed against it in any such proceeding, consents to or acquiesces in the appointment of a trustee, custodian, receiver or liquidator of it or of all or any substantial part of its assets or properties, takes any action looking to its dissolution or liquidation, or an order for relief is entered under the Bankruptcy Code against Lessee or such Guarantor; (x) within sixty (60) days after the commencement of any proceedings against Lessee or a Guarantor seeking reorganization, arrangement, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceedings shall not have been dismissed or if within sixty (60) days after the appointment, without Lessee's or such Guarantor's acquiescence, of any trustee, custodian, receiver, or liquidator of it or of all or any substantial part of its assets and properties, such appointment shall not be vacated; (xi) Lessee or any Guarantor terminates its existence, sells all or substantially all of its assets or consolidates with or merges into any other entity,  or enters into a plan of division or fundamental organizational change, or its stockholders, members or partners sell all or substantially all of their stock, membership or partnership interests; (xii) the entry of any judgment, order, award or decree against Lessee or a Guarantor which has not been discharged or execution thereof not stayed within sixty (60) days after entry and which is not fully covered by applicable insurance, and a determination by Lessor in good faith but in its sole discretion, that the same could have a material adverse effect on the Lessee or the Guarantor or the Lessor's rights with respect to the Equipment or the prospect for full and punctual payment of the payments due under a Schedule; (xiii) the death of a Guarantor (if an individual); or (xiv) Lessor shall determine that there has been a material adverse change in

the financial condition or business operations of the Lessee since the date of the execution of this Lease or that the Lessee's ability to perform its obligations hereunder has been materially impaired.

**18. REMEDIES.**   Upon the occurrence and continuation of an Event of Default, Lessor may, at its option, exercise any one or more of the following remedies with respect to one or more Schedules (all of which are cumulative and not exclusive of any other right or remedy available to Lessor): (i) terminate the Schedule as to any or all items of Equipment; (ii) whether or not a Schedule is terminated as to any or all items of Equipment, take possession of the Equipment or any items of Equipment, and for such purpose enter upon any premises without liability for so doing or Lessor may require Lessee and Lessee agrees to return said Equipment to Lessor at Lessee's expense as provided in this Agreement.   Lessee specifically agrees that if the Equipment is mobile equipment and/or normally or actually used in more than one location, whether self-propelled or transported by other equipment, including but not limited to trucks, tractors, trailers, other motor vehicles, cranes, lifts, digging equipment, cement mixers, rolling stock and all other construction, transportation, and mining equipment and all attachments and accessions to any of the foregoing, then Lessor shall have the right on five (5) days notice to require Lessee at Lessee's expense to deliver the Equipment fully assembled to a single location for possession by Lessor; (iii) sell, dispose of, hold or lease any Equipment as Lessor, in its sole discretion, may determine; (iv) recover from Lessee, as liquidated damages for loss of a bargain and not as a penalty, a sum equal to the aggregate of the following under the Schedule:  (a) all rentals, late charges and other sums due to the date of default under the Schedule; (b) any expenses paid or incurred by Lessor in connection with the repossession, transporting, holding, insuring, repairing, refurbishing and subsequent sale, lease or other disposition of the Equipment including reasonable attorneys fees and legal expenses; (c) the present value (using a two percent (2%) per annum discount rate) of all unmatured rentals to become due during the remaining term of the Schedule, (d) the present value (using a two percent (2%) per annum discount rate) of the purchase price to be paid by Lessee to purchase the Equipment at the expiration of the term of the Schedule pursuant to any purchase agreement between Lessee and Lessor (whether such purchase agreement is an option or obligation of Lessee or an option of Lessor), but if the purchase price is the fair market value of the Equipment or if there is no purchase agreement, then Lessor may recover from Lessee the present value (using a two percent (2%) per annum discount rate) of the Equipment's estimated residual value at the end of the scheduled lease term; and (e) interest on the aggregate of the amounts specified in (a) through (d) from the date of default (or expenditure) at the rate of one and one-half percent (1.5%) percent per month, if not prohibited by law, otherwise at the highest lawful rate; and (v) generally exercise all of its other rights and remedies under the Uniform Commercial Code or other applicable law with respect to the Equipment and any additional collateral securing the Lessee's obligations under the Schedule.   **LESSEE WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON THIS AGREEMENT, ANY SCHEDULE OR ANY EQUIPMENT.**  Lessee shall in any event remain fully liable for damages as provided by law and for all costs and expenses incurred by Lessor on account of such default including, but not limited to, all court costs and reasonable attorney's fees inclusive of those incurred in any appeal and in bankruptcy proceedings including relief from stay motions, cash collateral motions and disputes concerning any Disclosure Statement and/or Bankruptcy Plan.

        Lessee shall remain liable for any deficiency after any sale, lease or other disposition of Equipment by Lessor. Lessee acknowledges that (i) Lessor shall have no obligation to clean-up or otherwise prepare the

Equipment or other collateral for sale; (ii) Lessor may comply with any applicable state or federal law requirements in connection with the disposition of the Equipment or other collateral and such compliance shall not be considered adversely to affect the commercial reasonableness of the disposition; (iii) Lessor may dispose of the Equipment or other collateral without giving any warranties and such procedure shall not be considered adversely to affect the commercial reasonableness of the sale; and (iv) if Lessor sells any of the Equipment or other collateral on credit, Lessee will be credited only with the payments actually made by the purchaser, received by the Lessor and applied to the indebtedness of the purchaser and if the purchaser fails to pay for the Equipment or other collateral, Lessor may resell the Equipment or other collateral and Lessee will be credited with the proceeds of the sale. The rights afforded Lessor hereunder shall not be deemed to be exclusive, but shall be in addition to any rights or remedies provided by law.  If any court of competent jurisdiction determines that any provision of this Section 18 is invalid or unenforceable, in whole or in part, such determination shall not prohibit Lessor from enforcing all other provisions hereunder and otherwise enforcing its rights and establishing its damages sustained as a result of any breach of this Agreement or any Schedule in any action or proceeding in which Lessor seeks to enforce its rights and recover such damages, in accordance with the laws of such jurisdiction.

**19. CROSS COLLATERALIZATION.**  Irrespective of the provision that each Schedule shall constitute a separate lease of the Equipment described in the Schedule, as additional security for the Lessee's obligations under each Schedule, Lessee grants to Lessor a security interest in (i) all of the Equipment set forth in every other Schedule and (ii) all machinery, equipment, goods and other property (collectively, the "additional collateral") covered by any other lease, security agreement, loan and security agreement or other agreement (collectively the "other agreements") between the Lessee and the Lessor whether such Schedules and other agreements are now in existence or hereafter come into existence and whether such other agreements were originally documented in the name of Lessor or assigned to Lessor, and Lessee assigns to the Lessor as security for its obligations under each Schedule, all of its right, title and interest in and to any surplus money to which Lessee may be entitled upon the sale or other disposition of the additional collateral.  Such additional collateral shall continue to secure the Lessee's obligations under each Schedule even after the obligations under the applicable Schedule or other agreement shall have been satisfied in full.  Anything above to the contrary notwithstanding, the benefit of the foregoing additional security provisions shall apply to the benefit of the Lessor and any assignee holding a Schedule only to the extent that the Lessor or such assignee is also the holder of one or more other Schedule(s) or other agreement(s).

**20. ASSIGNMENT.**  Lessor may grant security interests in or otherwise assign or transfer (or grant participations in) all or any part of this Agreement or any Schedule hereto or any rent or other sums due or to become due under a Schedule without Lessee's consent.  In the event Lessor assigns any Schedule hereto, (i) a copy of this Agreement together with the manually executed (ink-signed) original Schedule shall constitute original chattel paper under the Uniform Commercial Code; and (ii) the assignee holding the assigned Schedule shall be the Lessor of the Equipment set forth in such assigned Schedule and may exercise its rights and remedies with respect thereto separately and independently of the holder of any other Schedule. Lessee waives and agrees not to assert against any assignee any claims, defenses or set-offs that Lessee could assert against Lessor except for defenses which cannot be legally waived. Upon Lessor's giving notice to Lessee of any such assignment,

Lessee shall promptly acknowledge its obligations under the Schedule assigned and shall comply with the written directions of such assignee, shall make all rental and other payments due with respect to the assigned Schedule as such assignee may direct in writing and shall send all notices provided for or permitted under this Agreement as applicable to such assigned Schedule to such assignee. Following any such assignment the term "Lessor" shall be deemed to include or refer to Lessor's assignee, but no such assignee shall be deemed to assume any obligation or duty imposed upon Lessor hereunder arising prior to such assignment and Lessee shall look only to Lessor for performance thereof. As used in this Section 20, "assign" shall be deemed to include a pledge, sale of or grant of a security interest in, any of the Equipment or a Schedule by Lessor and the term "assignee" shall be deemed to refer to the recipient of such pledge, hypothecation, sale or security interest. This Agreement and any Schedule shall not be transferable or assignable by Lessee without the Lessor's express prior written consent and any such purported transfer or assignment by Lessee other than in compliance with the provisions of this Section 20 shall be null and void ab initio.

**21. SECURITY DEPOSIT.** If a Security Deposit is indicated in a Schedule then such Security Deposit shall secure all of Lessee's obligations to Lessor now or hereafter in existence. Lessor may, at its option, apply the Security Deposit, to cure any default of Lessee, whereupon Lessee shall promptly restore such Security Deposit to its original amount. Lessor shall return to Lessee any unapplied Security Deposit without interest upon full payment and performance of all of Lessee's obligations to Lessor.

**22. LESSEE'S WAIVERS.** To the extent permitted by applicable law, Lessee hereby waives any rights to (i) cancel this Agreement or any Schedule, (ii) repudiate this Agreement or any Schedule, (iii) revoke acceptance of the Equipment, (iv) recover damages from Lessor for any breaches of warranty or for any other reason, (v) a security interest in the Equipment in Lessee's possession or control for any reason, (vi) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under this Agreement or any Schedule, (vii) "cover" by making any purchase or lease of, or contract to purchase or lease, equipment in substitution for that due from Lessor, (viii) recover any general, special, incidental or consequential damages for any reason whatsoever, and (ix) specific performance, replevin, detinue, sequestration, claim and delivery or the like for any Equipment identified in the Schedules.

**23. PREJUDGMENT REMEDY WAIVER:** THE LESSEE ACKNOWLEDGES AND AGREES THAT THE TRANSACTION OF WHICH THIS AGREEMENT AND EACH SCHEDULE IS A PART IS A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION AND WAIVES ANY RIGHT TO A NOTICE AND HEARING UNDER CHAPTER 903A OF THE CONNECTICUT STATUTES, AS AMENDED, OR ANY OTHER STATUTE OR STATUTES IN CONNECTICUT OR ANY OTHER JURISDICTION AFFECTING PREJUDGMENT REMEDIES. LESSEE AUTHORIZES THE LESSOR'S COUNSEL TO ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER AND WAIVES ANY CLAIM IN TORT, CONTRACT OR OTHERWISE AGAINST LESSOR'S COUNSEL WHICH MAY ARISE OUT OF SUCH ISSUANCE OF THE WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER. THE LESSEE ACKNOWLEDGES AND STIPULATES THAT THE WAIVERS AND AUTHORIZATIONS GRANTED HEREIN ARE MADE KNOWINGLY AND FREELY AND AFTER FULL CONSULTATION WITH COUNSEL. SPECIFICALLY, THE LESSEE RECOGNIZES AND UNDERSTANDS

THAT THE EXERCISE OF LESSOR'S RIGHTS DESCRIBED ABOVE MAY RESULT IN THE ATTACHMENT OF OR LEVY AGAINST THE LESSEE'S PROPERTY, AND SUCH WRIT FOR A PREJUDGMENT REMEDY WILL NOT HAVE THE PRIOR WRITTEN APPROVAL OR SCRUTINY OF A COURT OF LAW OR OTHER OFFICIAL OFFICER NOR WILL LESSEE HAVE THE RIGHT TO ANY NOTICE OR PRIOR HEARING WHERE LESSEE MIGHT CONTEST SUCH A PROCEDURE. THE INTENT OF LESSEE IS TO GRANT TO LESSOR FOR GOOD AND VALUABLE CONSIDERATION THE RIGHT TO OBTAIN SUCH A PREJUDGMENT REMEDY AND TO ASSURE THAT ANY SUCH PREJUDGMENT REMEDY OBTAINED IS VALID AND CONSTITUTIONAL.

**24. GENERAL PROVISIONS.** No person except a duly authorized officer of Lessor shall have any power to modify, amend or waive any of the provisions hereof. Neither the manufacturer nor vendor of the Equipment nor any salesman or agent thereof is an agent of Lessor. So long as Lessee is not in default hereunder, Lessee shall peacefully and quietly hold the Equipment during the term hereof without interference from Lessor. All the Lessee's covenants herein shall survive the termination of any Schedule or this Agreement. Notices hereunder shall be in writing and shall be deemed given when personally delivered, or three days after having been mailed to the other party at the address specified for each herein or to such other address as either party may, from time to time, provide in writing to the other party. In the event that Lessee shall fail duly and promptly to perform any of its obligations under the provisions of this Agreement or any Schedule, Lessor may, at its option, immediately or at any time thereafter, perform the same for the account of Lessee without thereby waiving such default, and any amount paid, or expenses or liability incurred, by Lessor in such performance, together with interest at the rate of one and one-half percent (1.5%) per month thereon, but not in excess of the amount permitted by any applicable law, until paid by Lessee to Lessor, shall be payable by Lessee upon demand as additional rent for the Equipment. Forbearance or indulgence by Lessor in any regards shall not constitute a waiver of the covenant or condition to be performed by Lessee to which the same may apply. The section headings are for convenience and are not a part of this Agreement. Lessor is authorized and empowered to date this Agreement and the Schedules and to fill in blank spaces in accordance with the terms of the transaction, including, but not limited to, dates, serial numbers, equipment descriptions and the assignment of an account number. Lessor may correct patent errors in Equipment descriptions or other terms, upon notice to Lessee. This Agreement and any Schedule shall be binding upon and inure to the benefit of the successors and assigns of the Lessor and shall bind all persons who become bound as a Lessee to this Agreement (but nothing herein is intended to authorize Lessee to assign this Agreement without Lessor's express prior written consent). THIS AGREEMENT AND ANY OTHER WRITTEN AGREEMENT SIMULTANEOUSLY EXECUTED EMBODIES THE ENTIRE AGREEMENT BETWEEN LESSOR AND LESSEE WITH RESPECT TO THE SUBJECT MATTER HEREOF AND SUPERSEDES ANY PRIOR PROPOSAL LETTERS, COMMMITMENT LETTERS, ORAL COVENANTS OR AGREEMENTS OR NEGOTIATIONS. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. **THIS AGREEMENT AND ALL SCHEDULES AND RELATED DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT.** LESSEE HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CONNECTICUT AND THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED

HEREBY. LESSEE WAIVES ANY OBJECTIONS BASED UPON VENUE OR "FORUM NON CONVENIENS" IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING. LESSEE CONSENTS THAT PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE SERVED UPON IT BY REGISTERED MAIL DIRECTED TO LESSEE AT ITS ADDRESS SET FORTH AT THE HEAD OF THIS AGREEMENT OR IN ANY MANNER PERMITTED BY APPLICABLE LAW OR RULES OF COURT. LESSEE HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF CONNECTICUT AS ITS AGENT TO RECEIVE SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING. This Agreement may not be terminated, modified or amended, nor shall any waiver of any provisions herein be deemed to have occurred regardless of the action or non-action of the Lessor in connection therewith except upon written agreement of the parties. This Agreement and any Schedule shall not be binding upon the Lessor until accepted and executed on behalf of Lessor at its Bridgeport, Connecticut office. If executed by more than one Lessee, then the obligations of each Lessee shall be joint and several. Unless otherwise expressly provided, only one original of this Agreement shall be executed, which execution may be by separate counterparts which together shall constitute a single document. The parties agree that any copy of this Agreement, including any photocopy, telecopy or facsimile thereof, shall have the same force and effect as though it were an original for all purposes, including but not limited to the enforcement of any of the terms and conditions thereof and the admissibility of this Agreement in any legal or equitable proceeding, but except as provided below and in Section 20, such copy shall not be used to determine the original chattel paper. In the event that Lessee or any Guarantor provides Lessor with a copy of this Agreement, then Lessee and Guarantor agree to immediately thereafter provide Lessor with the original. Lessee agrees that if Lessee delivers a copy but not the manually executed original of a Schedule to Lessor, then Lessor may execute, designate and mark such copy as the "Original" Schedule for purposes of determining the original chattel paper pursuant to Section 20 of this Agreement. Lessor shall have no obligation to disburse the proceeds of any Schedule if a material adverse change occurs in the financial condition or business operations of Lessee or Guarantor, if an Event of Default exists or would exist with the giving of notice and/or passage of time, or if any credit or documentation requirement remains outstanding.

| Accepted at Lessor's Office at 850 Main Street, BC-03, Bridgeport, CT 06604 | The undersigned signatory affirms that he/she has read the terms and conditions printed above, is a duly authorized officer, partner, member, manager or proprietor of the Lessee, and has authority to execute this Master Lease Agreement on its behalf. |
|---|---|
| LESSOR: <br><br> **PEOPLE'S CAPITAL AND LEASING CORP.** | LESSEE: <br><br> **RESPONSE ENVELOPE, INC.** |
| AUTHORIZED OFFICER: <br><br> BY: _Raquel Hasduby_ <br> TITLE: _AVP - Documentation_ | AUTHORIZED OFFICER, PARTNER, MEMBER, MANAGER OR PROPRIETOR: <br><br> BY: _____ <br> TITLE: _U V D_ <br> FEDERAL IDENTIFICATION NO.: ████████ |

## CERTIFICATE OF SECRETARY

The undersigned does hereby certify that he/she is Secretary of Response Envelope, Inc. (hereafter called the "Corporation") and the following is a true, complete and correct copy of resolutions duly adopted by the Board of Directors of the Corporation and that such resolutions are in full force and effect:

"RESOLVED, that the Corporation enter into a Master Lease Agreement No. 5904 dated July 15, 2019 and various Schedules thereto from time to time (collectively, the "Agreements") with PEOPLE'S CAPITAL AND LEASING CORP. (hereafter called "PCLC"), substantially in the form presented, providing for the lease by the Corporation from PCLC of the Equipment described therein (the "Equipment"); and it is further

RESOLVED, that the officers of the Corporation and each of them singly, hereby are authorized (a) to execute and deliver said Agreements in the name and on behalf of the Corporation, either in the form presented or with such changes therein as the officer executing the same may approve, his approval and authority to be conclusively evidenced by his execution thereof, such execution to be valid and binding on the Corporation with or without the corporate seal of the Corporation, (b) to carry out the obligations and enforce the rights of the Corporation under said Agreements, (c) to execute and deliver in the name and on behalf of the Corporation such amendments and other documents as may be requested or required by PCLC in connection with said Agreements including (without limiting the generality of the foregoing) promissory notes, security agreements and additional agreements with respect to any interim financing in connection with the acquisition of any Equipment, Purchase agreements, covenants, an Acceptance or Delivery Certificate in respect of any Equipment and agreements with assignees of PCLC and (d) to take all other action deemed by them necessary or advisable in connection with the foregoing; and it is further

RESOLVED, that the officers of the Corporation, and each of them singly, hereby are authorized from time to time on behalf of the Corporation to enter into additional loan, lease or other financing transactions with PCLC upon such terms and conditions as the officers, or any one of them, shall determine, and in that connection to execute and deliver in the name and on behalf of the Corporation such documents as PCLC requires; and it is further

RESOLVED, that all acts authorized in the foregoing resolutions, but performed prior to the adoption of these resolutions, are hereby ratified and affirmed."

The undersigned further certifies that the persons whose names, titles and signatures appear below are duly elected (or appointed), qualified and acting officers of the Corporation and hold on the date of this Certificate the offices set forth opposite their respective names, and the signatures appearing opposite their respective names are the genuine signatures of such persons:

| NAME OF OFFICER | TITLE OF OFFICER | SIGNATURE OF OFFICER |
|---|---|---|
| DAVID JURICH | C O O | |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Corporation as of the 15th Day of July, 2019.

(Corporate Seal)

_____
Signature of Secretary

THOMAS ULRICH
Print Name

1

(In the case where the Secretary will execute transactional documents by this resolution, the below Additional Certificate must be signed by a second officer of the Corporation.)

### ADDITIONAL CERTIFICATE

The undersigned does hereby certify that he/she is _____(title) of the above Corporation and certifies that the foregoing is a true, complete and correct copy of resolutions duly adopted by the Board of Directors and that the above are the names, titles and genuine signatures of presently-elected and acting officers of the Corporation.

_____ (signature)

_____ (print name)

---

(In the case where the person who is the Secretary is the sole officer of the Corporation, the below Sole Officer Certificate must also be signed and notarized)

### SOLE OFFICER CERTIFICATE

I, _____ am the sole officer of the above name corporation and my signature on the Master Lease Agreement, Schedules and all related documents is my true and genuine signature.

Very Truly Yours,

_____

Subscribed and sworn to before me this _____ day of _____, 20__.

_____
Notary Public

residing at: _____

my commission expires: _____

LEAVE BLANK

2

# EXHIBIT B

## SCHEDULE TO MASTER LEASE AGREEMENT

**SCHEDULE NO.** 001 **dated** July 15, 2019 **to MASTER LEASE AGREEMENT NO.** 5904 **dated** July 15, 2019

**Lessor:**
People's Capital And Leasing Corp.
850 Main Street, BC-03
Bridgeport, CT 06604

**Lessee:**
Response Envelope, Inc.
1340 South Baker Avenue
Ontario, CA 91761

Lessor and Lessee have entered into a Master Lease Agreement No. 5904 dated July 15, 2019 (the "Master Lease") the provisions of which are hereby incorporated herein and this is a Schedule to the Master Lease. All terms used herein which are defined in the Master Lease and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Lease.

    **1. LEASE OF EQUIPMENT.** Lessor leases to Lessee and Lessee leases from Lessor the Equipment described in the attached Schedule A (the "Equipment") on the terms specified herein and in any rider or supplement hereto and in the Master Lease.

    **2. LEASE TERM AND PAYMENTS.** Lessee agrees to pay rent to Lessor for the Equipment (plus applicable sales/use taxes) in successive monthly installments as set forth in the following payment schedule and agrees to the other information set forth below:

### PAYMENT SCHEDULE

| ADVANCE RENTAL (Plus Taxes if Applicable) | NUMBER OF SUCCESSIVE RENTAL PAYMENTS (Exclusive of Advance Rent) AND PAYMENT PERIOD | RENTAL AMOUNT PER PERIODIC PAYMENT PERIOD (Plus Taxes, if Applicable) |
|---|---|---|
| $28,420.00 | Eighty-Four (84) Monthly | $3,569.85 |

Rental Commencement Date: _____ Security Deposit (if any): _____
Estimated Date of Shipment: _____
Equipment Location:  1340 South Baker Avenue, Ontario, CA 91761
Special Provisions (if any): _____

    **3. DISBURSEMENT OF PROCEEDS.** Lessee hereby authorizes Lessor to disburse the proceeds of this Schedule as follows:

| | |
|---|---|
| $255,780.00 | To: W + D North America, Inc. |
| $ 28,420.00 | To PCLC for Advance Rental |
| $284,200.00 | **TOTAL PROCEEDS** |

    **4. PAYMENT ADJUSTMENT RIDER.** See the Payment Adjustment Rider attached hereto.

The lease consisting of this Schedule (including the provisions of the Master Lease incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct lease from any other Schedule to the Master Lease. Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Lease shall constitute the original lease chattel paper. By its execution and delivery of this Schedule, Lessee hereby reaffirms all of the warranties and representations contained in the Master Lease as of the date hereof and further warrants and represents to the Lessor that no Event of Default has occurred and is continuing as of the date hereof. This Schedule shall not be in effect until accepted by Lessor at its Bridgeport, CT office.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Raquel Hardwin_

TITLE: _AVP - Documentation_

**RESPONSE ENVELOPE, INC.**

BY: _____

TITLE: _____

1

## SCHEDULE A

The following description of property supplements and is part of Schedule No. 001 dated July 15, 2019 to Master Lease Agreement No. 5904 dated July 15, 2019 between Response Envelope, Inc. as Lessee and People's Capital and Leasing Corp. as Lessor and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property.

**Equipment Location:** 1340 South Baker Avenue, Ontario, CA 91761

**Vendor: W+D North America, Inc.**

Equipment Description:

One (1) 2018 W+D Halm IJet-7956 w/ Dual Feeders, Memjet Inkjet system, Xltron RIP and 10 liter bladder S/N 7656

All property above together with all parts, related software (embedded therein or otherwise), any replacements, replacement parts, additions, accessions, repairs, attachments and accessories incorporated therein and/or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

Lessee has no power to sell, transfer, or otherwise dispose of said property.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _Raquel Hardubr_

TITLE: _AVP - Documentation_

**RESPONSE ENVELOPE, INC.**

BY: _____

TITLE: _C O N_____

# EXHIBIT C

**SCHEDULE TO MASTER LEASE AGREEMENT**

**SCHEDULE NO. 002 DATED JUNE 8, 2020 TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019**

**Lessor:**
People's Capital and Leasing Corp.
850 Main Street, BC-03
Bridgeport, CT 06604

**Lessee:**
Response Envelope, Inc.
1340 South Baker Avenue
Ontario, CA 91761

Lessor and Lessee have entered into a Master Lease Agreement No. 5904 dated July 15, 2019 (the "Master Lease") the provisions of which are hereby incorporated herein and this is a Schedule to the Master Lease. All terms used herein which are defined in the Master Lease and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Lease.

      1.  **LEASE OF EQUIPMENT**. Lessor leases to Lessee and Lessee leases from Lessor the Equipment described in the attached Schedule A (the "Equipment") on the terms specified herein and in any rider or supplement hereto and in the Master Lease.

      2.  **LEASE TERM AND PAYMENTS.** Lessee agrees to pay rent to Lessor for the Equipment (plus applicable sales/use taxes) in successive monthly installments as set forth in the following payment schedule and agrees to the other information set forth below:

**PAYMENT SCHEDULE**

| ADVANCE RENTAL (Plus Taxes if Applicable) | NUMBER OF SUCCESSIVE RENTAL PAYMENTS (Exclusive of Advance Rent) AND PAYMENT PERIOD | RENTAL AMOUNT PER PERIODIC PAYMENT PERIOD (Plus Taxes, if Applicable) |
|---|---|---|
| $600,000.00 | Ninety-six (96) Monthly | $23,261.00 |

Rental Commencement Date: _January 30, 2021_ Security Deposit (if any): _____
Estimated Date of Shipment: _____
Equipment Location: 1340 South Baker Avenue, Ontario, CA 91761
Special Provisions (if any): _____

      3.  **DISBURSEMENT OF PROCEEDS.** Lessee hereby authorizes Lessor to disburse the proceeds of this Schedule as follows:

          $  600,000.00  To: PCLC for Advance Rental
          $  243,933.00  To: Response Envelope, Inc.
          $1,695,397.00  To: W + D North America, Inc.
          $2,539,330.00  **TOTAL PROCEEDS**

      4.  **PAYMENT ADJUSTMENT RIDER.** See the Payment Adjustment Rider attached hereto.

The lease consisting of this Schedule (including the provisions of the Master Lease incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct lease from any other Schedule to the Master Lease. Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Lease shall constitute the original lease chattel paper. By its execution and delivery of this Schedule, Lessee hereby reaffirms all of the warranties and representations contained in the Master Lease as of the date hereof and further warrants and represents to the Lessor that no Event of Default has occurred and is continuing as of the date hereof. This Schedule shall not be in effect until accepted by Lessor at its Bridgeport, CT office.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**RESPONSE ENVELOPE, INC.**

BY: X _____
          David Junkin
TITLE: COO

**SCHEDULE A**

The following description of property supplements and is part of Schedule No. 002 dated June 8, 2020 to Master Lease Agreement No. 5904 dated July 15, 2019 between Response Envelope, Inc. as Lessee and People's Capital and Leasing Corp. as Lessor and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property.

**Equipment Location:**   1340 South Baker Avenue, Ontario, CA 91761

**Vendor:**          W+D North America, Inc.

    Equipment Description:

One (1) 2020 W+D 628RC Rotary Envelope Manufacturing Machine with Center Delivery  S/N: 16456

All property above together with all parts, related software (embedded therein or otherwise), any replacements, replacement parts, additions, accessions, repairs, attachments and accessories incorporated therein and/or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

Lessee has no power to sell, transfer, or otherwise dispose of said property.

**PEOPLE'S CAPITAL AND LEASING CORP.**          **RESPONSE ENVELOPE, INC.**

BY: _____          BY: X _____
                                              David Junkin
TITLE: _____          TITLE: COO

**PAYMENT ADJUSTMENT RIDER**

**RIDER TO SCHEDULE NO. 002 DATED JUNE 8, 2020 TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019 (COLLECTIVELY, THE "CONTRACT") BETWEEN RESPONSE ENVELOPE, INC. AS LESSEE (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LESSOR ("PCLC")**

1. <u>Purpose</u>.  This Rider sets forth the terms of adjustment to the payments set forth in the Contract.  Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

2. <u>Definitions</u>.  The following terms shall have the following meanings herein:

(a)  "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing.  The parties may by a separate writing select a different manner of determining the Adjustment Date.

(b)  "Final Base Rate" shall mean the Eight (8) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

(c)  "Preliminary Payments" shall mean the payments set forth in the Contract, consisting of $600,000.00 plus applicable tax due upon execution (the "Advance Payment") followed by Ninety-six (96) consecutive monthly payments in the amount of $23,261.00 commencing one (1) month following the Adjustment Date.

(d)  "Preliminary Base Rate" shall mean 1.33%

3. <u>Adjustment of Payments</u>.    The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate.  If the Adjustment Date occurs after June 8, 2020, and the Final Base Rate is greater than the Preliminary Base Rate, then the Preliminary payments shall be revised.  For each increase of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- The Advance Payment and any end of lease options and obligations shall remain unchanged.
- Each of the Ninety-six (96) payments in the amount of $23,261.00 shall increase by $8.93.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder. Notwithstanding the foregoing, the spread plus Preliminary Base Rate shall in no event be less than 3.25%

4. <u>PCLC's Requirements</u>. The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC.  If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied.  The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**RESPONSE ENVELOPE, INC.**

BY: X _____
David Junkin

TITLE: <u>COO</u>

# EXHIBIT D

**DEMAND PROMISSORY NOTE**

$1,745,397.00                                          June 8, 2020

FOR VALUE RECEIVED, the undersigned (hereinafter called "Borrower") promises to pay to the order of PEOPLE'S CAPITAL AND LEASING CORP. (hereinafter called "PCLC"), at 850 Main Street, BC-03, Bridgeport, CT 06604 or at such other place as may be designated in writing by the holder of this Note, ON DEMAND, One Million, Seven Hundred Forty-five Thousand, Three Hundred Ninety-seven and 00/100 ($1,745,397.00) together with interest thereon at a fluctuating per annum interest rate equal to 2.50% above the Libor Rate.  The "Libor Rate" shall mean the one (1) month London InterBank Offered Rate quoted in U.S. Dollars (rounded upward to two decimal places) as published in the "Money Rates" section of the WALL STREET JOURNAL at http://www.wsj.com, or any successor or similar section or publishing service selected by Lender, computed on a 360 day basis.  The interest shall be payable one month following the first advance and on the same day of each month thereafter with all unpaid and accrued interest being payable at the time of demand.  The interest accrued in any month shall be determined by reference to the Libor Rate in effect on the first business day of such month.

To secure payment of this Note, Borrower granted a security interest in its property pursuant to a Security Agreement dated as of this date (the "Agreement").

If Borrower fails to pay any interest installment on its due date, which failure continues for a period of five (5) days, Borrower shall pay a late charge thereon equal to one and one half (1.50%) percent per month from the due date to the date of payment, but only to the extent permitted by law.  After the maturity of this Note, Borrower shall pay interest on the unpaid balance equal to one and one half (1.50%) percent per month, but only to the extent permitted by law.  In the event that PCLC institutes an action upon this Note or under the Agreement, Borrower shall pay, in addition to unpaid principal, interest and unpaid late charges, the expenditures incurred by PCLC in enforcing collection of this Note and its rights under the Agreement, including all reasonable attorneys' fees.  In addition, if Borrower defaults under this Note, then PCLC shall be entitled to all the rights and remedies of a secured party and as set forth in the Agreement.  **BORROWER AND PCLC WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY ACTION OR PROCEEDING BASED UPON THIS NOTE.**

The proceeds of this Note are being disbursed by PCLC on Borrower's behalf in connection with the lease of certain equipment (the "Equipment") described in Schedule No. 002 dated June 8, 2020 to a Master Lease Agreement No. 5904 dated July 15, 2019 between Borrower and PCLC (the "Lease").  Advances hereunder shall only occur after PCLC has received all items it requires, including from vendors or third parties, and updated financial information if requested.  Provided Borrower is not in default under this Note, the Agreement or the Lease, no prior demand for payment has been made by PCLC and the conditions of the succeeding sentence are met, this Note shall be "converted" to, and the principal amount advanced deemed included in the total amount disbursed pursuant to the Lease.  The aforesaid "conversion" shall not occur unless and until Borrower has satisfied all credit and documentation requirements of PCLC, including but not limited to the execution and delivery of said Lease and a Delivery Certificate.  Upon such "conversion", this Note shall be deemed paid in full, however the Agreement shall not be canceled until the Equipment has been fully delivered and accepted, and the Equipment has been fully funded by PCLC.  Borrower has committed to the Lease and without PCLC's consent, Borrower may not lease or finance the Equipment with another entity or prepay this Note except in connection with the conversion of the Note to the Lease so long as PCLC is willing to complete the Lease.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF PCLC AND BORROWER HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT.**

PCLC shall have the right to fill in any blanks left in this Note, the Agreement, or in the Lease and to correct patent errors therein; but the same may not be otherwise modified or discharged, in whole or in part, and no right or remedy of PCLC hereunder or under any other agreement may be waived except by a written agreement signed by PCLC.

RESPONSE ENVELOPE, INC.

BY:X_____
          David Junkin
TITLE:  __COO_____

**LIBOR ADDENDUM TO DEMAND PROMISSORY NOTE**

Agreement between People's Capital and Leasing Corp. ("PCLC") and Response Envelope, Inc. ("Borrower").

The parties agree to the following concerning the LIBOR Rate in the Demand Promissory Note dated as of June 8, 2020 ("Note") by Borrower in favor of PCLC:

In the event that (1) on any date on which the LIBOR Rate would have otherwise become effective, PCLC determines in its reasonable estimation (which determination shall, upon written to notice to Borrower, be final and conclusive) that adequate and fair means do not exist for ascertaining the required LIBOR Rate; or (2) PCLC determines in its reasonable estimation (which determination shall, upon written to notice to Borrower, be final and conclusive) at any time that the making or continuation of the interest   rate on the outstanding principal balance of the Loan evidenced by the Note to the LIBOR Rate has been made unlawful by compliance by PCLC with any law or governmental regulation, guideline or order or interpretation or change thereof by any governmental authority charged with the interpretation or administration thereof or with any request or directive of any such governmental authority (whether having the force of law or not), then, and in any such event, PCLC shall promptly notify Borrower of PCLC's determination, and until PCLC notifies Borrower that the circumstances giving rise to PCLC's determination no longer apply or exist, the use of the LIBOR Rate shall be suspended and interest on the outstanding principal balance of the Loan shall be payable at the Alternate Rate plus a spread in basis points that when added to the Alternate Rate would generate a return to PCLC for as long as Alternate Rate is in effect substantially the same as that generated by the LIBOR Rate plus the same spread in basis points as set forth in the Note.

"Alternate Rate" applicable to a particular LIBOR Interest Period shall mean a rate per annum equal to the rate for US Dollar deposits with maturities of one (1) month, as are offered by the Reference Banks to prime banks in the London interbank market for the applicable LIBOR Interest Period as of approximately 11:00 a.m., London time, on the day that is two (2) LIBOR Business Days preceding the Reset Date.  Said rate shall correspond to the "USD-LIBOR-Reference Banks" rate as defined in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc.  If the Alternate Rate as described above is not ascertainable, then the Alternate Rate shall mean the nearest equivalent benchmark rate for a term of one (1) month as reasonably determined by PCLC on the Reset Date.

Dated as of June 8, 2020

PCLC:
**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

BORROWER:
**RESPONSE ENVELOPE, INC.**

BY: x _____
                David Junkin

TITLE: COO

# EXHIBIT E

## SCHEDULE TO MASTER LEASE AGREEMENT

**SCHEDULE NO. 003 DATED FEBRUARY 7, 2022 TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019**

**Lessor:**
People's Capital and Leasing Corp.
850 Main Street, BC-03
Bridgeport, CT 06604

**Lessee:**
Response Envelope, Inc.
1340 South Baker Avenue
Ontario, CA 91761

Lessor and Lessee have entered into a Master Lease Agreement No. 5904 dated July 15, 2019 (the "Master Lease") the provisions of which are hereby incorporated herein and this is a Schedule to the Master Lease. All terms used herein which are defined in the Master Lease and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Lease.

**1. LEASE OF EQUIPMENT.** Lessor leases to Lessee and Lessee leases from Lessor the Equipment described in the attached Schedule A (the "Equipment") on the terms specified herein and in any rider or supplement hereto and in the Master Lease.

**2. LEASE TERM AND PAYMENTS.** Lessee agrees to pay rent to Lessor for the Equipment (plus applicable sales/use taxes) in successive monthly installments as set forth in the following payment schedule and agrees to the other information set forth below:

**PAYMENT SCHEDULE**

| ADVANCE RENTAL (Plus Taxes if Applicable) | NUMBER OF SUCCESSIVE RENTAL PAYMENTS (Exclusive of Advance Rent) AND PAYMENT PERIOD | RENTAL AMOUNT PER PERIODIC PAYMENT PERIOD (Plus Taxes, if Applicable) |
|---|---|---|
| N/A | Ninety-six (96) Monthly | $25,010.00 |

Rental Commencement Date: _April 2, 2023_    Security Deposit (if any): _____
Estimated Date of Shipment: _____
Equipment Location: _1340 South Baker Avenue, Ontario, CA 91761_
Special Provisions (if any): _____

**3. DISBURSEMENT OF PROCEEDS.** Lessee hereby authorizes Lessor to disburse the proceeds of this Schedule as follows:

$1,832,900.00  To: W + D North America, Inc.
$1,832,900.00  **TOTAL PROCEEDS**

**4. PAYMENT ADJUSTMENT RIDER.** See the Payment Adjustment Rider attached hereto.

The lease consisting of this Schedule (including the provisions of the Master Lease incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct lease from any other Schedule to the Master Lease. Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Lease shall constitute the original lease chattel paper. By its execution and delivery of this Schedule, Lessee hereby reaffirms all of the warranties and representations contained in the Master Lease as of the date hereof and further warrants and represents to the Lessor that no Event of Default has occurred and is continuing as of the date hereof. This Schedule shall not be in effect until accepted by Lessor at its Bridgeport, CT office.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _SVP_

**RESPONSE ENVELOPE, INC.**

BY: X _____
         David Junkin

TITLE: COO

## SCHEDULE A

The following description of property supplements and is part of Schedule No. 003 dated February 7, 2022 to Master Lease Agreement No. 5904 dated July 15, 2019 between Response Envelope, Inc. as Lessee and People's Capital and Leasing Corp. as Lessor and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property.

**Equipment Location:**    1340 South Baker Avenue, Ontario, CA 91761

**Vendor:**    W+D North America, Inc.

Equipment Description:

One (1) 2022 W+D 628BC Rotary Envelope Manufacturing Machine    S/N: M116537

All property above together with all parts, related software (embedded therein or otherwise), any replacements, replacement parts, additions, accessions, repairs, attachments and accessories incorporated therein and/or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

Lessee has no power to sell, transfer, or otherwise dispose of said property.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____SVP_____

**RESPONSE ENVELOPE, INC.**

BY: X _____
             David Junkin
TITLE: COO

# PAYMENT ADJUSTMENT RIDER

**RIDER TO SCHEDULE NO. 003 DATED FEBRUARY 7, 2022 TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019 (COLLECTIVELY, THE "CONTRACT") BETWEEN RESPONSE ENVELOPE, INC. AS LESSEE (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LESSOR ("PCLC")**

1. <u>Purpose</u>. This Rider sets forth the terms of adjustment to the payments set forth in the Contract. Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

2. <u>Definitions</u>. The following terms shall have the following meanings herein:

(a) "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing. The parties may by a separate writing select a different manner of determining the Adjustment Date.

(b) "Final Base Rate" shall mean the Seven (7) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

(c) "Preliminary Payments" shall mean the payments set forth in the Contract consisting of Eighty-four (84) consecutive monthly payments in the amount of $25,010.00 commencing one (1) month following the Adjustment Date.

(d) "Preliminary Base Rate" shall mean 1.85%

3. <u>Adjustment of Payments.</u> The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate. If the Adjustment Date occurs after February 7, 2022 and the Final Base Rate is greater or less than the Preliminary Base Rate, then the Preliminary payments shall be revised. For each increase or decrease of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- Each of the Eighty-four (84) payments in the amount of $25,010.00 shall increase or decrease by $8.78.
- The end of lease options and obligations shall remain unchanged.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder. Notwithstanding the foregoing, the spread plus Preliminary Base Rate shall in no event be less than 3.25%

4. <u>PCLC's Requirements</u>. The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC. If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied. The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____SVP_____

**RESPONSE ENVELOPE, INC.**

BY: X _____
David Junkin

TITLE: COO

# EXHIBIT F

## DEMAND PROMISSORY NOTE

$1,649,610.00                                                    February 7, 2022

FOR VALUE RECEIVED, the undersigned (hereinafter called "Borrower") promises to pay to the order of PEOPLE'S CAPITAL AND LEASING CORP. (hereinafter called "PCLC"), at 850 Main Street, BC-03, Bridgeport, CT 06604 or at such other place as may be designated in writing by the holder of this Note, ON DEMAND, One Million, Six Hundred Forty-nine Thousand, Six Hundred Ten and 00/100 ($1,649,610.00) together with interest thereon at a rate of 0.7% above the Prime Rate of PCLC's parent (on a floating basis as such Prime Rate may from time to time change during the period of this Note), computed on a 360 day basis. The interest shall be payable one month following the advance and on the same day of each month thereafter with all unpaid and accrued interest being payable at the time of demand.

To secure payment of this Note, Borrower granted a security interest in its property pursuant to a Security Agreement dated as of this date (the "Agreement").

If Borrower fails to pay any interest installment on its due date, which failure continues for a period of five (5) days, Borrower shall pay a late charge thereon equal to one and one half (1.50%) percent per month from the due date to the date of payment, but only to the extent permitted by law. After the maturity of this Note, Borrower shall pay interest on the unpaid balance equal to one and one half (1.50%) percent per month, but only to the extent permitted by law. In the event that PCLC institutes an action upon this Note or under the Agreement, Borrower shall pay, in addition to unpaid principal, interest and unpaid late charges, the expenditures incurred by PCLC in enforcing collection of this Note and its rights under the Agreement, including all reasonable attorneys' fees. In addition, if Borrower defaults under this Note, then PCLC shall be entitled to all the rights and remedies of a secured party and as set forth in the Agreement. **BORROWER AND PCLC WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY ACTION OR PROCEEDING BASED UPON THIS NOTE.**

The proceeds of this Note are being disbursed by PCLC on Borrower's behalf in connection with the lease of certain equipment (the "Equipment") described in Schedule No. 003 dated February 7, 2022 to a Master Lease Agreement No. 5904 dated July 15, 2019 between Borrower and PCLC (the "Lease"). Advances hereunder shall only occur after PCLC has received all items it requires, including from vendors or third parties, and updated financial information if requested. Provided Borrower is not in default under this Note, the Agreement or the Lease, no prior demand for payment has been made by PCLC and the conditions of the succeeding sentence are met, this Note shall be "converted" to, and the principal amount advanced deemed included in the total amount disbursed pursuant to the Lease. The aforesaid "conversion" shall not occur unless and until Borrower has satisfied all credit and documentation requirements of PCLC, including but not limited to the execution and delivery of said Lease and a Delivery Certificate. Upon such "conversion", this Note shall be deemed paid in full, however the Agreement shall not be canceled until the Equipment has been fully delivered and accepted, and the Equipment has been fully funded by PCLC. Borrower has committed to the Lease and without PCLC's consent, Borrower may not lease or finance the Equipment with another entity or prepay this Note except in connection with the conversion of the Note to the Lease so long as PCLC is willing to complete the Lease.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF PCLC AND BORROWER HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT.**

PCLC shall have the right to fill in any blanks left in this Note, the Agreement, or in the Lease and to correct patent errors therein; but the same may not be otherwise modified or discharged, in whole or in part, and no right or remedy of PCLC hereunder or under any other agreement may be waived except by a written agreement signed by PCLC.

RESPONSE ENVELOPE, INC.

BY: _____

TITLE: _____

# EXHIBIT G

## SCHEDULE TO MASTER LEASE AGREEMENT

**SCHEDULE NO. 004 DATED MAY 12, 2022 TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019**

**Lessor:**
People's Capital and Leasing Corp.
850 Main Street, BC-03
Bridgeport, CT 06604

**Lessee:**
Response Envelope, Inc.
1340 South Baker Avenue
Ontario, CA 91761

Lessor and Lessee have entered into a Master Lease Agreement No. 5904 dated July 15, 2019 (the "Master Lease") the provisions of which are hereby incorporated herein and this is a Schedule to the Master Lease. All terms used herein which are defined in the Master Lease and not otherwise specifically defined herein shall have the same meanings as set forth in the Master Lease.

    **1. LEASE OF EQUIPMENT.** Lessor leases to Lessee and Lessee leases from Lessor the Equipment described in the attached Schedule A (the "Equipment") on the terms specified herein and in any rider or supplement hereto and in the Master Lease.

    **2. LEASE TERM AND PAYMENTS.** Lessee agrees to pay rent to Lessor for the Equipment (plus applicable sales/use taxes) in successive monthly installments as set forth in the following payment schedule and agrees to the other information set forth below:

**PAYMENT SCHEDULE**

| ADVANCE RENTAL (Plus Taxes if Applicable) | NUMBER OF SUCCESSIVE RENTAL PAYMENTS (Exclusive of Advance Rent) AND PAYMENT PERIOD | RENTAL AMOUNT PER PERIODIC PAYMENT PERIOD (Plus Taxes, if Applicable) |
|---|---|---|
| $247,981.00 | Eighty-four (84) Monthly | $31,806.00 |

Rental Commencement Date: _June 26, 2023_   Security Deposit (if any): _____
Estimated Date of Shipment: _____
Equipment Location: _1340 South Baker Avenue, Ontario, CA 91761_
Special Provisions (if any): _____

    **3. DISBURSEMENT OF PROCEEDS.** Lessee hereby authorizes Lessor to disburse the proceeds of this Schedule as follows:

        $2,479,805.00  To: W + D North America, Inc.
        $2,479,805.00  **TOTAL PROCEEDS**

    **4. PAYMENT ADJUSTMENT RIDER.** See the Payment Adjustment Rider attached hereto.

The lease consisting of this Schedule (including the provisions of the Master Lease incorporated herein) and all riders and supplements to this Schedule constitutes a separate and distinct lease from any other Schedule to the Master Lease. Unless otherwise expressly provided, only one original of this Schedule shall be executed and such original together with a copy of the Master Lease shall constitute the original lease chattel paper. By its execution and delivery of this Schedule, Lessee hereby reaffirms all of the warranties and representations contained in the Master Lease as of the date hereof and further warrants and represents to the Lessor that no Event of Default has occurred and is continuing as of the date hereof. This Schedule shall not be in effect until accepted by Lessor at its Bridgeport, CT office.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _SVP_

**RESPONSE ENVELOPE, INC.**

BY: X _____
           David Junkin
TITLE: _COO_

## SCHEDULE A

The following description of property supplements and is part of Schedule No. 004 dated May 12, 2022 to Master Lease Agreement No. 5904 dated July 15, 2019 between Response Envelope, Inc. as Lessee and People's Capital and Leasing Corp. as Lessor and may be attached to said Schedule and any related UCC Financing Statements, Acceptance or Delivery Certificate or other document describing the property.

**Equipment Location:**   1340 South Baker Avenue, Ontario, CA 91761

**Vendor:**                W+D North America, Inc.

Equipment Description:

One (1) 2023 W+D 628RC Reel Fed Rotary Envelope Manufacturing Machine   S/N:   M16560

All property above together with all parts, related software (embedded therein or otherwise), any replacements, replacement parts, additions, accessions, repairs, attachments and accessories incorporated therein and/or affixed thereto, modifications and substitutions thereto and all proceeds thereof including insurance proceeds.

Lessee has no power to sell, transfer, or otherwise dispose of said property.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _SVP_____

**RESPONSE ENVELOPE, INC.**

BY: X _____
         David Junkin

TITLE: COO

## PAYMENT ADJUSTMENT RIDER

**RIDER TO SCHEDULE NO. 004 DATED MAY 12, 2022 TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019 (COLLECTIVELY, THE "CONTRACT") BETWEEN RESPONSE ENVELOPE, INC. AS LESSEE (THE "OBLIGOR") AND PEOPLE'S CAPITAL AND LEASING CORP. AS LESSOR ("PCLC")**

1. <u>Purpose</u>. This Rider sets forth the terms of adjustment to the payments set forth in the Contract. Terms defined in the Contract and not otherwise defined herein shall have the meanings defined in the Contract.

2. <u>Definitions</u>. The following terms shall have the following meanings herein:

(a) "Adjustment Date" shall mean the date PCLC first disburses any portion of the proceeds of the Contract, provided however, if PCLC makes vendor progress payments or other interim advances pursuant to a demand note or other interim financing document, then the Adjustment Date shall mean the date on which such interim financing "converts" to the term transaction evidenced by the Contract, which date shall be the date Obligor accepts the Equipment following delivery or other earlier date which the parties select in writing. The parties may by a separate writing select a different manner of determining the Adjustment Date.

(b) "Final Base Rate" shall mean the Seven (7) year cost of funds rate as provided internally by PCLC's parent, on the Adjustment Date, and posted by PCLC in the ordinary course of business.

(c) "Preliminary Payments" shall mean the payments set forth in the Contract consisting of $247,981.00 due upon execution (the "Advance Payment") followed by Eighty-four (84) consecutive monthly payments in the amount of $31,806.00 commencing one (1) month following the Adjustment Date.

(d) "Preliminary Base Rate" shall mean 3.15%

3. <u>Adjustment of Payments.</u> The Preliminary Payments were calculated based on a spread over the Preliminary Base Rate. If the Adjustment Date occurs after May 12, 2022 and the Final Base Rate is greater or less than the Preliminary Base Rate, then the Preliminary payments shall be revised. For each increase or decrease of one (1) basis point (i.e., 1/100 of 1%) in the Final Base Rate above the Preliminary Base Rate, the Preliminary Payments shall be revised as follows:

- Each of the Eighty-four (84) payments in the amount of $31,806.00 shall increase or decrease by $10.79.
- The advance payment and end of lease options and obligations shall remain unchanged.

Immediately after the determination of the revised payments due under the Contract, Obligor shall, at the request of PCLC, execute an acknowledgment reflecting the revised payment schedule, but the failure of PCLC to make such a request or the failure of Obligor to execute the acknowledgment shall in no way diminish Obligor's obligations hereunder.

4. <u>PCLC's Requirements</u>. The commencement of the Contract is subject to satisfaction of all documentation and credit requirements of PCLC. If such requirements are not satisfied by the Adjustment Date, then at PCLC's option, the Adjustment Date shall be the date when such requirements are satisfied. The calculation of the Contract payments under this Rider will supersede any prior proposal or quotation.

IN WITNESS WHEREOF, the parties have executed this Rider simultaneously with the Contract.

**PEOPLE'S CAPITAL AND LEASING CORP.**

BY: _____

TITLE: _____

**RESPONSE ENVELOPE, INC.**

BY: X _____
David Junkin

TITLE: <u>COO</u>

# EXHIBIT H

## DEMAND PROMISSORY NOTE

$2,231,824.50                                             May 12, 2022

FOR VALUE RECEIVED, the undersigned (hereinafter called "Borrower") promises to pay to the order of PEOPLE'S CAPITAL AND LEASING CORP. (hereinafter called "PCLC"), at 850 Main Street, BC-03, Bridgeport, CT 06604 or at such other place as may be designated in writing by the holder of this Note, ON DEMAND, Two Million, Two Hundred Thirty-one Thousand, Eight Hundred Twenty-four and 50/100 ($2,231,824.50) together with interest thereon at a rate of 1.50% above the Prime Rate of PCLC's parent (on a floating basis as such Prime Rate may from time to time change during the period of this Note), computed on a 360 day basis. The interest shall be payable one month following the advance and on the same day of each month thereafter with all unpaid and accrued interest being payable at the time of demand.

To secure payment of this Note, Borrower granted a security interest in its property pursuant to a Security Agreement dated as of this date (the "Agreement").

If Borrower fails to pay any interest installment on its due date, which failure continues for a period of five (5) days, Borrower shall pay a late charge thereon equal to one and one half (1.50%) percent per month from the due date to the date of payment, but only to the extent permitted by law. After the maturity of this Note, Borrower shall pay interest on the unpaid balance equal to one and one half (1.50%) percent per month, but only to the extent permitted by law. In the event that PCLC institutes an action upon this Note or under the Agreement, Borrower shall pay, in addition to unpaid principal, interest and unpaid late charges, the expenditures incurred by PCLC in enforcing collection of this Note and its rights under the Agreement, including all reasonable attorneys' fees. In addition, if Borrower defaults under this Note, then PCLC shall be entitled to all the rights and remedies of a secured party and as set forth in the Agreement. **BORROWER AND PCLC WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY ACTION OR PROCEEDING BASED UPON THIS NOTE.**

The proceeds of this Note are being disbursed by PCLC on Borrower's behalf in connection with the lease of certain equipment (the "Equipment") described in Schedule No. 004 dated May 12, 2022 to a Master Lease Agreement No. 5904 dated July 15, 2019 between Borrower and PCLC (the "Lease"). Advances hereunder shall only occur after PCLC has received all items it requires, including from vendors or third parties, and updated financial information if requested. Provided Borrower is not in default under this Note, the Agreement or the Lease, no prior demand for payment has been made by PCLC and the conditions of the succeeding sentence are met, this Note shall be "converted" to, and the principal amount advanced deemed included in the total amount disbursed pursuant to the Lease. The aforesaid "conversion" shall not occur unless and until Borrower has satisfied all credit and documentation requirements of PCLC, including but not limited to the execution and delivery of said Lease and a Delivery Certificate. Upon such "conversion", this Note shall be deemed paid in full, however the Agreement shall not be canceled until the Equipment has been fully delivered and accepted, and the Equipment has been fully funded by PCLC. Borrower has committed to the Lease and without PCLC's consent, Borrower may not lease or finance the Equipment with another entity or prepay this Note except in connection with the conversion of the Note to the Lease so long as PCLC is willing to complete the Lease.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF PCLC AND BORROWER HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT.**

PCLC shall have the right to fill in any blanks left in this Note, the Agreement, or in the Lease and to correct patent errors therein; but the same may not be otherwise modified or discharged, in whole or in part, and no right or remedy of PCLC hereunder or under any other agreement may be waived except by a written agreement signed by PCLC.

RESPONSE ENVELOPE, INC.

BY: _____

TITLE: C O O _____

# EXHIBIT I

**COVENANT RIDER TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019 (THE "AGREEMENT") BETWEEN M&T CAPITAL AND LEASING CORPORATION ("MTCL") AND RESPONSE ENVELOPE, INC. ("LESSEE")**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the above captioned Agreement is hereby amended to add the following.:

1.  Lessee agrees that so long as any Lease remains outstanding and unpaid, Lessee shall:

    a.  Maintain a Debt Service Coverage Ratio of at least 1.15 to 1.00. "Debt Service Coverage Ratio" is defined as (i) Lessee's net income less taxes, less distributions, and changes in due to/from related parties and stockholders plus depreciation, amortization, and interest expense divided by (ii) Lessee's current portion of long-term debt, capital lease obligations and interest expense. The covenant will be tested annually and based on the review quality fiscal year-end financial statement for Response Envelope, Inc.

    b.  Deliver to MTCL a compliance certificate for each fiscal year during the term of the Agreement (and if MTCL so requests, also for the fiscal year ending immediately prior to the commencement of the Agreement) executed by Lessee's chief financial officer stating the results of Lessee's operations for such year in terms of the financial covenant(s) set forth above. The compliance certificate for a fiscal period shall be delivered within the period of time allowed under the Agreement for the Lessee to deliver its financial statements for such period.

    c.  Provide an update debt schedule upon request.

A failure by MTCL to insist on strict compliance with any provision of this Covenant Rider in any fiscal period shall not constitute a waiver of Lessee's obligation to comply with such provision in any subsequent period. Except as expressly provided herein, all accounting terms used herein shall be interpreted in accordance with generally accepted accounting principles as in effect from time to time.

2.  A failure by Lessee to maintain any of the above financial covenant(s) shall constitute an additional Event of Default under the Agreement.

3.  All terms used herein which are defined in the Agreement and not otherwise defined herein shall have the same meanings as set forth in the Agreement.

4.  This Covenant Rider shall apply to all Schedules to the Agreement, both presently existing and future.

5.  Except as modified by this Covenant Rider, all terms and provisions of the Agreement remain unmodified and in full force and effect, and MTCL and Lessee hereby ratify and confirm each and all such terms and provisions.

IN WITNESS WHEREOF, the parties have executed this Covenant Rider on December 29, 2023.

**M&T CAPITAL AND LEASING CORPORATION**                    **RESPONSE ENVELOPE, INC.**

BY: _PETER ESPOSITO_                                        BY: _____
       Peter J Esposito
TITLE: _Senior Vice President_                              TITLE: _____

**COVENANT RIDER TO MASTER LEASE AGREEMENT NO. 5904 DATED JULY 15, 2019 (THE "AGREEMENT") BETWEEN M&T CAPITAL AND LEASING CORPORATION ("MTCL") AND RESPONSE ENVELOPE, INC. ("LESSEE")**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the above captioned Agreement is hereby amended to add the following.:

1.  Lessee agrees that so long as any Lease remains outstanding and unpaid, Lessee shall:

    a.  Maintain a Debt Service Coverage Ratio of at least 1.15 to 1.00. "Debt Service Coverage Ratio" is defined as (i) Lessee's net income less taxes, less distributions, and changes in due to/from related parties and stockholders plus depreciation, amortization, and interest expense divided by (ii) Lessee's current portion of long-term debt, capital lease obligations and interest expense. The covenant will be tested annually and based on the review quality fiscal year-end financial statement for Response Envelope, Inc.

    b.  Deliver to MTCL a compliance certificate for each fiscal year during the term of the Agreement (and if MTCL so requests, also for the fiscal year ending immediately prior to the commencement of the Agreement) executed by Lessee's chief financial officer stating the results of Lessee's operations for such year in terms of the financial covenant(s) set forth above. The compliance certificate for a fiscal period shall be delivered within the period of time allowed under the Agreement for the Lessee to deliver its financial statements for such period.

    c.  Provide an update debt schedule upon request.

A failure by MTCL to insist on strict compliance with any provision of this Covenant Rider in any fiscal period shall not constitute a waiver of Lessee's obligation to comply with such provision in any subsequent period. Except as expressly provided herein, all accounting terms used herein shall be interpreted in accordance with generally accepted accounting principles as in effect from time to time.

2.  A failure by Lessee to maintain any of the above financial covenant(s) shall constitute an additional Event of Default under the Agreement.

3.  All terms used herein which are defined in the Agreement and not otherwise defined herein shall have the same meanings as set forth in the Agreement.

4.  This Covenant Rider shall apply to all Schedules to the Agreement, both presently existing and future.

5.  Except as modified by this Covenant Rider, all terms and provisions of the Agreement remain unmodified and in full force and effect, and MTCL and Lessee hereby ratify and confirm each and all such terms and provisions.

IN WITNESS WHEREOF, the parties have executed this Covenant Rider on December 29, 2023.

**M&T CAPITAL AND LEASING CORPORATION**

BY: _____

TITLE: _____

**RESPONSE ENVELOPE, INC.**

BY: _____

TITLE: President

# EXHIBIT J

## CORPORATE GUARANTY

WHEREAS, **JAL Equity Corp** (herein called "Guarantor"), is the indirect parent entity of **Response Envelope, Inc.** (herein called the "Obligor"), and the continued successful operations of the Obligor will directly benefit Guarantor; and

WHEREAS, the Obligor is desirous of having M&T Capital and Leasing Corporation (herein called "MTCL") continue to extend financial accommodations to the Obligor, and MTCL is unwilling to continue to extend financial accommodations to the Obligor unless Guarantor guarantees the obligations of the Obligor, as hereafter set forth:

NOW THEREFORE, in consideration of the foregoing and in order to induce MTCL to continue to extend financial accommodations to the Obligor in connection to that certain Master Lease Agreement No. 5904 dated July 15, 2019 and all Schedules thereto (herein collectively called the "Agreement", which term shall include any modifications, amendments, renewals or extensions thereof) with the Obligor, Guarantor agrees as follows:

1.  Guarantor unconditionally and irrevocably guarantees to MTCL the prompt payment in full of all indebtedness and obligations of every kind and nature now and hereafter owing by the Obligor to MTCL under the Agreement.

2.  Guarantor unconditionally and irrevocably guarantees to MTCL the prompt, full and faithful performance and discharge by the Obligor of each and every term, condition, agreement, and warranty to be performed by the Obligor under the Agreement.

3.  Guarantor unconditionally and irrevocably agrees to reimburse MTCL for all expenses, costs and reasonable attorney's fees incurred by it in enforcing any of its rights and remedies against the Obligor and/or Guarantor or any other person or concern liable thereon.

4.  Guarantor agrees to pay all of the foregoing amounts and perform all of the foregoing obligations notwithstanding that any part or all of the Agreement or any other agreements or financial accommodation shall be void or voidable or unenforceable as against the Obligor or any of the Obligor's creditors, including a trustee in bankruptcy or receiver of Obligor, by reason of any fact or circumstance, including, without limitation, failure of any person to file any document or to take any other action to make the Agreement enforceable in accordance with its terms. The liability of Guarantor shall be an absolute and primary obligation of payment and MTCL shall not be required to first (i) proceed against the Obligor; (ii) proceed against or exhaust any security held from the Obligor or any guarantor; or (iii) pursue any other remedies it may have, including remedies against other guarantors.

5.  Guarantor waives notice of acceptance hereof, and of all notices and demands of any kind to which Guarantor may be entitled, including, without limitation, demands of payment and notices of nonpayment, default, protest and dishonor to Guarantor or the Obligor or to the makers or endorsers of any notes or other instruments for which Guarantor may be liable hereunder.  Guarantor further waives notice of and hereby consents to any agreement or arrangement for payment, extension, subordination, moratoria, composition, discharge or release of the whole or any part of the Obligor's obligations under the Agreement, the modification or amendment of any of the terms of the Agreement, the forbearance by MTCL in the exercise of any rights against the Obligor, the release of other guarantors or the compromise of their obligations and the change in location or release of any equipment or collateral or the taking of a security interest in any additional or substituted equipment or collateral; and none of the same shall in any way impair Guarantor's liability hereunder. MTCL shall be under no obligation to insure, protect or otherwise preserve the equipment or any other collateral, which may secure any indebtedness, guaranteed hereunder.

6.   All sums at any time to Guarantor's credit and any of Guarantor's property at any time in MTCL's possession may be held by MTCL as security for all of Guarantor's obligations hereunder. If Guarantor possesses any property owned or leased by Obligor upon which MTCL has a security interest or interest as lessor (hereinafter "MTCL Collateral"), then Guarantor subordinates any interest of Guarantor in the MTCL Collateral to the interest of MTCL. MTCL may file a Uniform Commercial Code financing statement naming Guarantor as debtor to provide notice of the security interest of MTCL in the MTCL Collateral.  Guarantor waives any right to sublet or exercise any purchase option regarding the MTCL Collateral. Upon Guarantor's receipt of notice of an Event of Default under an obligation of Obligor to MTCL, then Guarantor shall surrender possession of the MTCL Collateral to MTCL, or in lieu thereof shall, upon MTCL's request pay directly to MTCL any sums due under Guarantor's agreement with Obligor with respect to the MTCL Collateral, free of all defenses setoffs or counterclaims which Guarantor may have against Obligor.

7. This Guaranty will continue to be effective or will be reinstated, as the case may be, if at any time any payment made to MTCL is rescinded or must be returned upon the insolvency, bankruptcy, or reorganization of the Obligor,

or otherwise, as if such payment had not been made. Guarantor expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration or any other claim which Guarantor may now or hereafter have against the Obligor for the obligations guaranteed hereunder or against or with respect to the property of the Obligor arising from the existence or performance of this Guaranty.

8. This Guaranty shall continue in full force and effect until terminated by (i) mutual written consent of MTCL and Guarantor or (ii) the satisfaction of the payment obligations of Obligor under the Agreement, which termination shall occur automatically upon satisfaction of such payment obligations.

9. ANY ASSIGNEE OF MTCL AND ALL SUBSEQUENT ASSIGNEES SHALL HAVE ALL OF THE RIGHTS OF MTCL HEREUNDER AND MAY ENFORCE THIS GUARANTY OR UNENFORCEABILITY OF ANY PROVISION OF THIS GUARANTY SHALL NOT AFFECT THE VALIDITY, LEGALITY OR ENFORCEABILITY OF ANY OF ITS OTHER PROVISIONS. LEGAL RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CONNECTICUT. THIS GUARANTY SHALL BE BINDING ON GUARANTOR AND ITS SUCCESSORS AND ASSIGNS.

10. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE TRANSACTION OF WHICH THIS GUARANTY IS A PART IS A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION AND GUARANTOR WAIVES ANY RIGHT TO A NOTICE AND HEARING UNDER CHAPTER 903A OF THE CONNECTICUT STATUTES, AS AMENDED, OR ANY OTHER STATUTE OR STATUTES IN CONNECTICUT OR OTHER JURISDICTIONS AFFECTING PREJUDGMENT REMEDIES. GUARANTOR AUTHORIZES MTCL'S COUNSEL TO ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER, PROVIDED THE COMPLAINT SHALL SET FORTH A COPY OF THIS WAIVER AND WAIVES ANY CLAIM IN TORT, CONTRACT OR OTHERWISE AGAINST MTCL'S COUNSEL WHICH MAY ARISE OUT OF SUCH ISSUANCE OF THE WRIT FOR A PREJUDGMENT REMEDY WITHOUT COURT ORDER. GUARANTOR ACKNOWLEDGES AND STIPULATES THAT THE WAIVERS AND AUTHORIZATIONS GRANTED HEREIN ARE MADE KNOWINGLY AND FREELY AFTER FULL CONSULTATION WITH COUNSEL. SPECIFICALLY, GUARANTOR RECOGNIZES AND UNDERSTANDS THAT THE EXERCISE OF MTCL'S RIGHTS DESCRIBED ABOVE MAY RESULT IN THE ATTACHMENT OF OR LEVY AGAINST GUARANTOR'S PROPERTY, AND SUCH WRIT FOR A PREJUDGMENT REMEDY WILL NOT HAVE THE PRIOR WRITTEN APPROVAL OR SCRUTINY OF A COURT OF LAW OR OTHER OFFICIAL OFFICER NOR WILL GUARANTOR HAVE THE RIGHT TO ANY NOTICE OR PRIOR HEARING WHERE GUARANTOR MIGHT CONTEST SUCH A PROCEDURE. THE INTENT OF GUARANTOR IS TO GRANT MTCL FOR GOOD AND VALUABLE CONSIDERATION THE RIGHT TO OBTAIN SUCH PREJUDGMENT REMEDY AND TO ASSURE THAT ANY SUCH PREJUDGMENT REMEDY IS VALID AND CONSTITUTIONAL.

11. GUARANTOR HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CONNECTICUT AND THE FEDERAL DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY. UNDERSIGNED WAIVES ANY OBJECTIONS BASED UPON VENUE OR "FORUM NON CONVENIENS" IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING. UNDERSIGNED CONSENTS THAT PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE SERVED UPON IT BY REGISTERED MAIL DIRECTED TO GUARANTOR AT ITS ADDRESS SET FORTH BELOW OR IN ANY MANNER PERMITTED BY APPLICABLE LAW OR RULES OF COURT.

12. Guarantor acknowledges the accuracy of the facts set forth in the recitals hereto and further acknowledges that it has, or will, receive substantial benefit and good and adequate consideration from each lease or other financing granted to the Obligor by MTCL pursuant to the Agreement and that neither MTCL nor any one connected with MTCL has made any warranty, representation, statement or covenant in order to induce Guarantor to execute this Guaranty. Guarantor warrants and represents that: (i) it is duly organized, validly existing and in good standing; (ii) it has the authority to carry on its business as presently conducted; (iii) this Guaranty is a legal, valid and binding obligation of Guarantor, enforceable against it in accordance with its terms; (iv) it has full power and authority to execute, deliver and perform its obligations under this Guaranty; (v) the execution and delivery of this Guaranty has been authorized by all requisite corporate action; (vi) the execution, delivery and performance of this Guaranty does not and will not constitute a breach, default or violation of or under Guarantor's articles of incorporation or by-laws or any law, order, judgment, injunction or agreement or instrument to which it is a party or may be bound; (vii) it has sufficient means for obtaining adequate information with respect to the business affairs and operations of the Obligor; and (viii) as of the date hereof and after giving effect to its contingent obligations under this Guaranty, it is solvent with assets, when fairly valued, in excess of its liabilities.

13. Guarantor shall provide MTCL with its company prepared fiscal year-end financial statements within one hundred twenty days (120) after the close of its fiscal year end which shall be prepared in accordance with generally

2

accepted accounting principles, its unaudited quarterly Financial Statements to include both a balance sheet and income statement within sixty (60) days after the end of its first three fiscal quarters in each fiscal year.

14.    This Guaranty may, if agreed to by MTCL, be executed using electronic signature using the DocuSign program or other program acceptable to MTCL in its sole discretion. Guarantor agrees that any electronic signature shall be valid and binding on Guarantor to the same extent as a manual, original signature, and that it will constitute the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to MTCL. Guarantor authorizes MTCL to accept a manually signed paper version of this Guaranty which has been converted into electronic form (such as a scanned into .pdf format), or an electronically signed Guaranty converted into another format, for transmission, delivery and/or retention. MTCL may, at its option, create one or more imaged electronic copies of this Guaranty which shall be deemed created in the ordinary course of MTCL's business, and destroy the original paper document. The electronically signed version of this Guaranty or electronic copy of this Guaranty, shall be considered an original for all purposes, and shall have the same legal effect, validity, and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, MTCL is under no obligation to accept an electronic signature in any form or in any format unless expressly agreed to by MTCL pursuant to procedures approved by MTCL; provided, however, without limiting the foregoing, (a) to the extent MTCL has agreed to accept such electronic signature, MTCL shall be entitled to rely on any such electronic signature without further verification, (b) persons who have purported to sign this Guaranty by electronic signature shall be conclusively presumed to have signed it with the intention to be bound thereby, (c) Guarantor assumes all risks that the Guaranty has an authorized and authentic electronic signature and (d) upon the request of MTCL any electronic signature shall be promptly followed by a manually executed, original counterpart.


Dated December 29 , 2023

**JAL EQUITY CORP**

BY: _____

TITLE: President

**SOLE OFFICER CERTIFICATE**

I, Eran Salu, am the sole officer of the corporation and my signature on the Guaranty on behalf of _JAL EQUITY CORP_ is my true and genuine signature.

Very Truly Yours,

Subscribed and sworn to before me this _21st_ day of _December_, 20~~22~~23

Notary Public _Tamela Violet Martin_

residing at: _101 Workman Ct. Eureka, MO 63025_

my commission expires: _06/21/2026_



# EXHIBIT K



**Evan S. Goldstein**
(t) 860.548.2609
(f) 860.548.2680
egoldstein@uks.com

July 10, 2025

***Via Certified Mail, Return Receipt Requested
and First-Class Mail***

Response Envelope, Inc.
1340 South Baker Avenue
Ontario, CA 91761
Attn: David Junkin and Ian Barber, Esq.

JAL Equity Corp.
3600 Torrey Pines Blvd.
Sarasota, FL 34238
Attn: Eran Salu

Marketing.com, LLC
101 Workman Court
Eureka, MO 63025
Attn: Steven Paley and Ian Barber, Esq.

**Re:    Notice of Default, Acceleration and Demand for Payment to
Response Envelope, Inc.**

Dear Mr. Junkin and Attorney Barber:

M&T Bank[1] ("Lender") is hereby formally notifying borrower Response Envelope, Inc. (the "Borrower") and guarantor JAL Equity Corp. (the "Guarantor" and with Borrower, the "Obligors") that the following documents (collectively, with all other related lease and loan documents, and as amended from time to time, the "Loan Documents") are in default:

---

[1] M&T Bank is formally known as M&T Capital and Leasing Corporation, which is formally known as People's Capital and Leasing Corp. As of April 2, 2022, People's United Bank, N.A., a national banking association located in Bridgeport, Connecticut, merged with and into M&T Bank, a New York state-chartered bank with a principal place of business located at One M&T Plaza, Buffalo, New York, with M&T Bank as the surviving bank. People's Capital and Leasing Corp. became a subsidiary of M&T Bank as of April 2, 2022. People's Capital and Leasing Corp. amended its name to M&T Capital and Leasing Corporation with the Connecticut Secretary of State on August 29, 2022. As of March 31, 2025, M&T Capital and Leasing Corporation merged with and into M&T Bank, with M&T Bank as the surviving entity.

Response Envelope, Inc.
July 10, 2025
Page 2

- Master Lease Agreement No. 5904 dated July 15, 2019 between Borrower and Lender;
- Schedule No. 001 to Master Lease Agreement No. 5904 dated July 15, 2019 between Borrower and Lender;
- Schedule No. 002 to Master Lease Agreement No. 5904 dated June 8, 2020 between Borrower and Lender;
- Demand Promissory Note dated June 8, 2020 between Borrower and Lender;
- Schedule No. 003 to Master Lease Agreement No. 5904 dated February 7, 2022 between Borrower and Lender;
- Demand Promissory Note dated February 7, 2022 between Borrower and Lender;
- Schedule No. 004 to Master Lease Agreement No. 5904 dated May 12, 2022 between Borrower and Lender;
- Demand Promissory Note dated May 12, 2022 between Borrower and Lender;
- Covenant Rider to Master Lease Agreement No. 5904 dated December 29, 2023 between Borrower and Lender; and
- Corporate Guaranty dated December 29, 2023 and executed by Guarantor in favor of Lender.

The Obligors have failed to comply with all their covenants under the Loan Documents and failed to provide the required financial reporting. As a result, the Obligors are now in Default, and Lender is declaring all obligations under the Loan Documents immediately due and payable, for which demand is hereby made. The Obligors owe to Lender the balance of $4,128,836.26. The Obligors are also responsible for all costs and expenses associated with the Loan Documents, which now include any and all legal fees or expenses incurred by Lender in the collection of the amounts due and owing under the Loan Documents or the foreclosure of any security interest, lien or collateral interest granted to Lender, as well as default interest, which continues to accrue pursuant to the Loan Documents.

Accordingly, the Lender is demanding from the Obligors payment in full of the entire outstanding balance of **$4,128,836.26 as of July 31 2025**, plus costs, expenses, and attorneys' fees, all of which continue to accrue, as well as default interest that continues to accrue pursuant to the Loan Documents. Lender will accept payment in the form of bank or certified funds. **If payment in full is not received within five (5) business days after the date of this demand letter, Lender has instructed its counsel, Updike, Kelly & Spellacy, P.C., to initiate an action against the Obligors without further notice or demand.** Failure to remit payment within five business days will result in Lender enforcing its rights under the Loan Documents, including but not limited to replevying and repossessing all collateral subject to the Loan Documents and seeking money damages.



5367842

Response Envelope, Inc.
July 10, 2025
Page 3

Although the Lender may have previously made extensions and allowed for forbearance prior to this notice of default, such actions do not imply any obligation or commitment of the Lender to further forbear and do not constitute a course of dealing or a course of conduct. The acceptance of any partial payment of any of the Obligors' obligations to Lender shall not be deemed a waiver or limitation of any of Lender's rights reserved herein as to the full amount of any unpaid balance. Lender reserves all rights and remedies available to it under the Loan Documents and applicable law, all of which are expressly reserved.

The Loan Documents shall remain in full force and effect in accordance with their terms and conditions. Nothing in this letter, any other correspondence or any oral communication between Lender and the Obligors should be construed to be a waiver, modification or release of any breach or default, whether now existing or hereafter arising, or of any of Lender's rights and remedies arising under the Loan Documents or common law.

In the event that it becomes necessary to initiate litigation to resolve this debt and enforce Lender's rights and remedies under the Loan Documents, all costs incurred by Lender, including but not limited to attorneys' fees, interest, costs, expenses, collections agents, and repair costs, will be the responsibility of the Obligors, as stated in the Loan Documents.

Please give me a call immediately to discuss demand, ability to make payments, surrender of the collateral and the resolution of the default without Lender's commencing legal proceedings against the Obligors.

Respectfully,

M&T Bank

Evan S. Goldstein



5367842